**UNITED STATES of America, Plaintiff,**

v.

**Timothy K. LINDGREN, Kathy Kirkeby, John Brennan, and Ronald D. Shaw, Defendants.**

**Civ. No. A3–95–4.**

United States District Court,
D. North Dakota,
Southeastern Division.

May 1, 1995.

---

John T. Schneider, Fargo, ND and Iris Goldschmidt, Washington, DC, for plaintiff.

Monty G. Mertz and Peter B. Crary, Fargo, ND, for defendants.

## MEMORANDUM AND ORDER FOR PRELIMINARY INJUNCTION

WEBB, Chief Judge.

### 1. *BACKGROUND:*

The United States, through the Attorney General, brought this action under the recently enacted Freedom of Access to Clinic Entrances Act ("FACE"). 18 U.S.C. § 248 (1994). The United States alleges the defendants violated FACE during their anti-abortion efforts relating to the Fargo Women's Health Organization ("FWHO") facility in Fargo, North Dakota. The Complaint seeks damages, civil penalties, and injunctive relief.

The United States filed a motion for a preliminary injunction (Docket No. 4). The court received and considered numerous briefs supported by affidavits. Testimony and oral argument were presented at a hearing on the motion held April 13, 1995.

### 2. REQUEST FOR JUDICIAL NOTICE:

The defendants filed a Request for Judicial Notice (Docket No. 34) seeking to have this court recognize that it is the policy of the North Dakota State Legislature and the North Dakota Supreme Court, based on several state statutes and judicial opinions, that life begins at conception and should be protected from that time within constitutional limits. The defendants argue this establishes a public policy against abortion to be considered under the fourth *Dataphase* factor, which is discussed below.

The court will not take judicial notice of this alleged public policy. The merits of the abortion debate are not at issue in this proceeding, and the court will resist all attempts to insert them. The FWHO has a legal right to perform abortions. The defendants and others have a constitutional right to state their disagreement with this practice. The public has an interest in seeing both the law and the right to free speech upheld. The court will act to vindicate those public interests. It is not for this court to say which side is right, but rather to ensure that both sides have their legal and constitutional rights protected.

### 3. WHETHER A PRELIMINARY INJUNCTION SHOULD BE ISSUED:

██ The case of *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir.1981) governs preliminary injunctions in the Eighth Circuit. Under *Dataphase*, a district court is to consider four factors in deciding whether to issue a preliminary injunction:

(1) The threat of irreparable harm to the movant;

(2) The balance between this harm and the injury that granting the injunction will inflict on other parties;

(3) The probability that movant will succeed on the merits; and

(4) The public interest.

*Dataphase at 113, Baker Electric Co–Op., Inc. v. Chaske*, 28 F.3d 1466, 1472–74 (8th Cir.1994).

> "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Calvin Klein Cosmetics Corp. v. Lenox Lab.*, 815 F.2d 500, 503 (8th Cir.1987); *Dataphase*, 640 F.2d at 114. However, a party moving for a preliminary injunction is required to show the threat of irreparable harm.

*Baker Electric Co–Op* at 1472.

#### A. Elements Of Proving FACE Violation:

The court will treat the third *Dataphase* factor, the probability that movant will succeed on the merits, as a threshold issue in this motion. To succeed on the merits, the United States will have to prove that each defendant engaged in activity prohibited by FACE.[1] Under 18 U.S.C. §§ 248(a) and (c)(2)(B) the damages, penalties, and injunctive relief sought in this action can only be ordered against individuals who are proved to have engaged in "prohibited activities."[2]

██ Section 248(a)(1) provides that a prohibited activity is committed by whomever:

> by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any

---

1. This issue relates to standing as well as to the right to relief. Under 18 U.S.C. § 248(c)(2)(A), the United States may only bring an action for civil remedies if the Attorney General "has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section."

2. For this reason the court will dismiss the John and Jane Doe unidentified defendants from this action, and order them stricken from the caption. The court cannot and will not impose FACE remedies against any person who has not been proven to have violated 18 U.S.C. § 248(a).

person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services.

Therefore the following elements must be proven in order to establish a violation of FACE:

1. Force, threat of force, or physical obstruction;

2. Done with the intent to;

3. Injure, intimidate, or interfere with a person, or attempt to do so;

4. Because that person has sought or provided, or is seeking or providing, or will seek or provide, reproductive health services.

For each defendant named, and for each type of conduct alleged, the court will first consider the third *Dataphase* factor: how probable it is that the United States will be able to prove all of these four elements. If the probability appears insubstantial, then no injunction will be issued relating to that conduct by that defendant. If the probability is substantial, then the court will go on to consider the first *Dataphase* factor: whether the United States has met its burden of proving a threat of irreparable harm. If not, then no injunction will be issued relating to that conduct by that defendant. If the burden has been met, then the court will go on to consider those two factors along with the remaining two *Dataphase* factors—the public interest and the balance of potential injury to the parties—to determine whether a preliminary injunction should be issued.

The United States offered proof in four areas. First, the conduct of the defendant Brennan during the summer of 1994, consisting mainly of statements by Brennan to several individuals. Second, the conduct of the defendants Lindgren and Shaw on November 22, 1994, when they sealed themselves in two disabled cars in front of the FWHO facility.

Third, the ongoing conduct of the defendants Lindgren, Kirkeby, and Brennan in front of the facility and at the airport. Fourth, the alleged conduct of Lindgren following a FWHO employee from the facility to her home in the summer of 1994.[3]

### B. *Brennan's Conduct:*

#### 1. Factual Allegations:

United States Deputy Marshal John Werner testified that he became familiar with Brennan in the summer of 1994, when he was one of six deputies assigned to the FWHO facility to enforce FACE. This duty was initially on a 24 hour basis. Late that summer, he and another deputy were in their parked cars across the street from the clinic at 3:00 a.m. He saw a person run toward the facility to the fence on the clinic's property line. The person hoisted himself up on the fence, gazed at the area where the deputies usually parked, and then dropped back to the ground. The person then saw the deputies across the street and ran toward them. The deputy then recognized the person as Brennan. Brennan was wearing a dark hat and a long dark raincoat on a warm night. The impact of Brennan's conduct is revealed by the fact that Werner, a calm and experienced law enforcement officer, was concerned enough that he drew his weapon inside his car. Brennan arrived at the car and conversed with the deputies. Werner testified that Brennan's statements "started normal" but then "went in all directions." Brennan indicated that he did not want the deputy marshals to be there. The conversation concluded without incident.

Werner also testified that in late summer of 1994 Brennan stated that if someone would shoot out the transformer on the power line to the clinic, the clinic would be out of business for a day. When Brennan made this statement he seemed agitated.

3. The United States alleged additional conduct in its pre-hearing affidavits. To the extent these allegations related conduct by unknown individuals, it cannot be considered in determining whether each of the named defendants engaged in prohibited conduct. To the extent these allegations related conduct that occurred before the effective date of FACE, May 26, 1994, it cannot be considered to be prohibited conduct. Pub.L. 103–259 § 6 ("This Act takes effect on the date of enactment of this Act, and shall apply only with respect to conduct occurring on or after such date.") It may be considered as evidence of the likelihood of the recurrence of forbidden conduct.

Fargo Police Lieutenant John Sanderson testified that in the middle and late summer of 1994 Brennan regularly visited the police station. Brennan's strange comments caused concern among desk officers. A policy was instituted to call a supervisor to the lobby when Brennan visited. Sanderson was once called to the lobby for that reason. Brennan was upset, and was discussing the FWHO facility. During this discussion, Brennan stated: "Some people think I am a psycho. I am a psycho. I'm a dangerous man." Sanderson believed him.

Jane Bovard is the Administrator of the FWHO. She testified that on June 30, 1994 she was awakened at 3:00 a.m. by ringing and pounding at the front door of her home. She went to the window and asked: "Who is it, what do you want?" Brennan responded: "Come out here, why won't you talk to me?" Brennan rang the bell and pounded on the door persistently. Bovard's husband got out his shotgun and loaded it. She called the police. Brennan was arrested, pleaded guilty to disorderly conduct, and was ordered to stay 100 feet from Bovard's home. Bovard testified he has violated that order twice.

Fargo Police Officer Tammy Lynk testified that she has known Brennan since 1991. She was working a night shift as the desk officer. Brennan would come into the police station at 2:00 or 3:00 a.m. and try to talk about abortion, which Lynk declined to discuss. Brennan once asked: "Do you think I'm nuts? I am nuts. I'm supposed to be taking medication."

Lynk went to the clinic on November 22, 1994, in connection with the car blockade, which is discussed below. Brennan was at the scene. An injunction issued by the North Dakota District Court in Cass County permitted only two anti-abortion individuals at a time within a 100 foot zone around the FWHO facility. The two individuals within the disabled cars filled that quota. Brennan came within the zone and Lynk told him to move out of it. Brennan became upset and angry, screaming and yelling. He said there might be a bomb in one of the cars, and there might be someone in the area with a remote detonator. Several times he shouted "boom!" and threw his hands in the air.

Lynk was shocked, and informed the other personnel on the scene. Brennan later came back within the zone and was arrested. No bomb was discovered in the cars.

John Miller is a security guard at the Air National Guard airbase in Fargo. He served at a security kiosk at the entrance to the base. He had been briefed that an individual had been coming to the kiosk late at night on a bicycle, that this individual had threatened to challenge base security, and that he should call for backup if it happened on his watch. At 4:00 a.m. on June 22, 1994, Brennan approached the kiosk on a bicycle. He engaged Miller in some small talk. He became agitated. He said he wanted to "wake up America" and "wake up the community." He stated: "Wouldn't it be easy for me to jump the fence, and put a bomb on an airplane." The base is adjacent to the facilities of Valley Aviation. It was later established that Dr. Miks flies into and out of Valley Aviation to perform abortions in Fargo.

George M. Miks, M.D., performs abortions at the FWHO facility two days each week. He testified that Brennan sometimes follows him from the clinic to the airport. With others, Brennan rushes to the fence and shouts at him. On "a couple" of occasions, Brennan has come into the airport office while Miks was present and "ranted and raved" that Miks is a killer. Once, while Miks was walking toward his airplane, Brennan rattled the fence at him.

### 2. Probability Of Success:

█ Reviewing this testimony, Brennan appears to have threatened force. At the hearing on the merits in this action the court will require strict proof before finding threats of force. Not all conduct that intimidates or causes uneasiness constitutes a threat of force. However, the court finds there is a substantial probability that the United States will be able to prove that Brennan's statements regarding shooting the transformer, bombing an airplane, and the possible presence of a bomb in one of the cars constituted threats of force made with the intent to intimidate or interfere with a person because that person was providing reproductive health services. This is particularly true in light of the other conduct and

statements attributed to Brennan. The fact that the persons to whom Brennan made the statements were not themselves seeking or providing reproductive health services poses a difficulty for the United States in proving intent, but is not a per se bar to a finding of a violation if Brennan's intent in making the statements can be proven or fairly inferred. The third *Dataphase* factor of probable success on the merits has therefore been satisfied.

### 3. Proof Of Irreparable Harm:

■ Regarding the first *Dataphase* factor, the United States has met its burden of proving a threat of irreparable harm. Brennan's counsel argued that his client is a harmless "motormouth," and that no one could reasonably be afraid of him. The defendant may offer evidence at the hearing on the merits to substantiate that argument. However, at this stage the defendant must be taken at his own words: he is a dangerous man who has expressed an interest in causing damage with weapons. The property damage, personal injury, or death that could result from the conduct Brennan has spoken of certainly constitute irreparable harm. The court cannot overlook Brennan's threats based on mere speculation that his threats *may* be idle. Furthermore, Brennan's threats in themselves cause harm by frightening those whom he threatens.

### 4. Weighing The Four *Dataphase* Factors:

The United States has met the threshold issue imposed by this court of showing a substantial probability of proving FACE violations by Brennan. It has also met the duty imposed by the Court of Appeals of proving a threat of irreparable harm. Therefore, the court must now evaluate the other two *Dataphase* factors, and then weigh all four factors together in deciding whether to issue a preliminary injunction.

The second *Dataphase* factor requires balancing the threatened harm against the injury an injunction would cause other parties. If a preliminary injunction is issued, Brennan will be injured by having limitations placed on his right to speak freely. The injury can be minimized by crafting the injunction to leave Brennan with ample forums to express his views, while providing some protection for the clients and personnel of FWHO. Even so, it is certain that issuing an injunction will cause Brennan some injury.

The injunction may decrease the likelihood that Brennan will do violence. It is difficult to calculate how likely he is to carry out his threats, and also difficult to calculate how much that threat would be decreased by an injunction. While the likelihood of the harm is difficult to estimate, the harm, in the form of property damage, injury, or death, is grave. Furthermore, an injunction would provide some protection against Brennan causing fright with further threats and threatening conduct.

■ It is difficult to balance the threat of harm against the injury to Brennan. At this preliminary stage, however, the balance tips in favor of granting some protection to the threatened individuals until the likelihood of Brennan acting on his very serious threats can be more thoroughly evaluated.

■ The fourth *Dataphase* factor requires the court to consider the public interest. The public has an interest in preserving the right of all individuals to speak freely. This is particularly true in the context of the abortion debate. If free speech on such a sensitive issue is stifled, misguided individuals may turn to violence to express their strong opinions. Free and open debate, responsibly conducted, is the only way to defuse tension and bridge differences of opinion. However, the public also has an interest in seeing that the law, including FACE, is upheld, and in seeing that threats of force are dealt with. While this court will zealously protect the free speech rights of all Americans, it also recognizes that Brennan has, on some occasions, crossed the line from expressing his opinions to making unlawful threats.

Weighing the four *Dataphase* factors leads to the conclusion that a preliminary injunction should be issued restricting Brennan's conduct until this case is decided on the merits. The court will craft that injunction to provide some protection against the

threatened harm while also preserving Brennan's right to speak.

### C. *November 22 Incident:*

#### 1. Factual Allegations:

Deputy Marshal Werner, Lt. Sanderson, Ms. Bovard, Officer Tammy Lynk, and Fargo Police Officer Steve Lynk all testified to the incident that occurred in front of the FWHO facility on November 22, 1994. The court viewed a short videotape of the scene made by Werner, and viewed four photographs and a diagram. The testimony and evidence is summarized as follows.

On the morning of November 22, two cars were discovered in front of the clinic. They were disabled and filled with scrap metal. After efforts to remove the cars were started, it was discovered that defendants Lindgren and Shaw were sitting on the ground beneath each car, with their bodies projecting up through holes into the interior of the cars. They were fastened to the scrap metal by bicycle locks around their necks. Rescue personnel had to cut into the cars, remove the debris, defeat the locks, and remove Lindgren and Shaw before the cars could be moved.

There are two entrances to the clinic property: a driveway and a sidewalk.[4] To enter the clinic property by car, one must use the driveway, which leads to a parking lot in back of the clinic. To enter on foot, one must use either the driveway or the private sidewalk that leads from the public sidewalk across a small front lawn to the clinic's front door. A hedge about seven feet high runs across the front of the front yard, and the only two openings in the hedge are at the driveway and sidewalk. The other three sides of the clinic property are enclosed by tall wooden fences.

The two disabled cars in front of the clinic on November 22, 1994, had been positioned to block the driveway and the sidewalk. One car was placed across the driveway, and the other blocked the opening in the hedge that provides access to the private sidewalk. The cars were in place by 7:20 a.m., and removal was completed at about 11:30 a.m.

#### 2. Probability of Success:

There was a great deal of argument, questioning, and testimony at the hearing concerning whether patients and personnel were able to gain access to the clinic while the cars were in place. The defendants argued that the cars were not a "physical obstruction," which is defined at 18 U.S.C. § 248(e)(4):

> The term "physical obstruction" means rendering impassable ingress to or egress from a facility that provides reproductive health services ... or rendering passage to or from such a facility ... unreasonably difficult or hazardous.

This argument has no merit. The cars rendered the clinic completely impassable to access by automobile. The cars also rendered pedestrian passage to the clinic unreasonably difficult, as it required climbing over a car, squeezing between a car and a fence, or scraping past the hedge. Furthermore, the crowd of emergency vehicles, rescue workers, police officers, protesters, and onlookers that was foreseeably drawn to the site made access unreasonably difficult by any means.

The court finds there is a substantial probability that the United States will be able to prove the defendants Lindgren and Shaw participated in the November 22, 1994 blockade, that this constituted a physical obstruction, and that Lindgren and Shaw acted with the intent to intimidate or interfere with a person because the person sought or provided reproductive health services. The third *Dataphase* factor of probable success on the merits therefore weighs in favor of injunctive relief.

#### 3. Proof Of Irreparable Harm:

The next question, therefore, is whether the United States has met its burden of proving the first *Dataphase* factor: a threat of irreparable harm. The defendants argue this single incident does not establish the "cognizable danger of recurrent violation" that must be shown to justify the issuance of an injunction, citing *Madsen v. Women's Health Center, Inc.,* — U.S. —, — n. 3, 114 S.Ct. 2516, 2524 n. 3, 129 L.Ed.2d 593 (1994). However, the car blockade was

---

4. A diagram of the area that was marked and received as Plaintiff's Exhibit 3.

not a spur-of-the-moment act. The blockade must have required lengthy planning preparation with a number of collaborators. Lindgren and Shaw must have had substantial time to reflect on their decisions to be locked by their necks in positions of discomfort and some danger. The defendants' deliberate decision to engage in such flagrant conduct reflects their state of mind, and evidences a cognizable danger that they will engage in similar conduct in the future. The recurrence of a blockade or similar conduct could cause irreparable harm by preventing individuals from obtaining lawful abortion services, or from doing so in a timely manner conducive to their health and safety.

### 4. Weighing The Four *Dataphase* Factors:

The United States has made the threshold showing of a substantial probability of proving Lindgren and Shaw violated FACE. It has also proved a threat of irreparable harm. Therefore, the court must now evaluate the other two *Dataphase* factors, and then weigh all four factors together in deciding whether to issue a preliminary injunction.

The second *Dataphase* factor requires balancing the threatened harm against the injury an injunction would cause to other parties. If a preliminary injunction is issued, Lindgren and Shaw will be injured by having limitations placed on their right to speak freely. However, an injunction aimed at this conduct can be very narrowly tailored to reduce that injury to a minimal level. While any infringement on free speech must be carefully weighed, the minimal infringement here is outweighed by the threat of another substantial disruption like the November 22 incident.

The fourth and final *Dataphase* factor requires the court to consider the public

interest. As was stated above, the public has an interest in preserving the right to free speech generally, and to free speech on controversial topics such as abortion in particular. The public also has an interest in not having its tax dollars and the time and attention of its police and emergency personnel squandered extracting protesters from self-immurement.[5] Given the relatively slight infringement on speech that would be incurred in crafting an injunction to prevent further similar incidents, the balance weighs in favor of injunctive relief.

Weighing the four *Dataphase* factors leads to the conclusion that a preliminary injunction should be issued restraining Lindgren and Shaw until this case is decided on the merits. The court will narrowly craft the relief provided to meet this particular threat.

### D. *Conduct At Clinic And Airport:*

#### 1. Factual Allegations:

Bovard, Miks, Lindgren, and Kirkeby testified concerning conduct by Lindgren, Kirkeby, and Brennan near the clinic and at the airport.[6] One area of testimony was conduct at the clinic driveway. Bovard testified that Lindgren and Kirkeby regularly appear in front of the clinic, and Brennan occasionally appears. Lindgren and Kirkeby usually position themselves at the driveway. Lindgren sometimes stands to the side of the driveway, but sometimes stands in the driveway forcing cars entering the driveway to stop. When a car stops, Kirkeby approaches from the side and signals the occupant to roll down the window. She then sticks her head and arm into the car, and hands literature to the occupant. Sometimes the stopped cars pull out of the driveway and leave.

Peggy Estenson, a staff nurse at the clinic, testified that Lindgren and Kirkeby slow cars down by standing very close to them.

---

**5.** Lindgren testified that he does not consider himself a "protester," but rather a "sidewalk counsellor." The court respects the distinction. However, in this instance Lindgren was functioning as a protester rather than as a counsellor. The court has directed the United States to produce evidence at the hearing on the merits relating to the costs incurred by the blockade, for the court to consider in ruling on the claim for damages that is presented in the Complaint.

**6.** In their testimony Bovard and Miks often made generalized statements about what these three defendants did. At this preliminary stage the court is only reviewing the probability of success, but at the hearing on the merits, a finding that a defendant has violated FACE will only be made if it is supported by proof of prohibited conduct by that individual defendant.

They place their bodies or arms in front of the windshield, and their feet where they would be run over by the car tires. Her car has been in this manner, and she can't move her car until they move their bodies.

The defendant Timothy K. Lindgren disputed this testimony. He is the Director of Christians in Action. He has been going to the FWHO facility two or three days each week for the past five years.[7] Lindgren testified that in those five years he only stopped approximately five cars by standing in front of them, and that was in 1991 or 1992. Lindgren explained that when he goes to the clinic, he stands at the driveway or at the street corners at either end of the block on which the clinic is located. When he is at the driveway, he stands on the sidewalk off to the side of the driveway, not in it. When a car begins to enter the driveway, he makes a gesture beckoning the driver to roll down the car window to talk with him. If the car stops, he then approaches it from the side, converses with the occupants, and hands literature to them. He never physically blocks the car from moving. He does not stand in the driveway because clinic personnel have, on twenty-five or thirty occasions, swerved or accelerated their cars at him.

The defendant Kathy Kirkeby also disputed Bovard's testimony concerning conduct at the driveway. She has been going to the clinic two days each week since July of 1991. She testified that she never sticks her head into stopped cars because if she did she would "have it taken off." She stands beside the driveway, not in it. She testified that Miks, driving Bovard's car, swerved at her.

Testimony was offered regarding other conduct. Bovard testified that Lindgren, Kirkeby, and Brennan scream "at the top of their lungs" in front of the clinic, disrupting patient services. She also testified that as she and Miks have driven away from the clinic, Kirkeby has chased their car, which sometimes gets stuck at a stop sign at a busy intersection at the end of the block. Miks testified that Lindgren, Kirkeby, and Brennan scream phrases like "stop killing babies"

into his car window when he goes to and from the clinic. They have run up to his car at the stop sign and done the same thing. They wave "outrageous signs." They have followed him to the airport and shouted loudly at him there. Once Miks was stopped at a traffic light near the airport. Lindgren was waiting there. Lindgren came over to the car and shouted at Miks. Lindgren was close enough that he had to move his feet when the car began moving.

Lindgren disputed this testimony. He testified that he never screams at the top of his lungs, and speaks only loudly enough to be heard by the intended listener, depending upon the circumstance. He does not "follow" Miks to the airport, although he does sometimes go to the airport after Miks leaves the clinic, to picket or address Miks further. He asserts the testimony of Bovard and Miks was "grossly exaggerated." He sometimes tries to talk to them, but never screams at them. Miks sometimes makes obscene gestures at him and Bovard once sprayed him with pepper spray. Regarding the incident at the traffic light, he only approached Miks' car and took a picture, without saying a word.[8]

Kirkeby also testified that she never screams or shouts at Bovard and Miks, and has never chased their car.

### 2. Likelihood Of Success:

In enacting FACE, Congress did not forbid harassment, rudeness, or intimidation, unless the conduct constitutes "force, threat of force, or physical obstruction." Conduct and speech can be deeply disturbing, offensive, and intrusive without amounting to a threat of force. Based on the evidence received to date, the court finds there is not a substantial probability that the conduct of Lindgren and Kirkeby at the clinic and at the airport will be proven to constitute force or a threat of force.

However, Bovard's testimony regarding the conduct of Lindgren and Kirkeby at the driveway indicates they "physically

---

7. Abortions are performed at the clinic on two days each week.

8. Even so, that is a strange thing to have done, and it must have been a disquieting experience for Miks.

obstructed" cars from entering the clinic driveway. She testified that Lindgren halts cars by standing in front of them, and that Kirkeby prevents them from moving again by placing parts of her body in them or in front of them. Lindgren and Kirkeby strongly deny this testimony.

This testimony is in direct conflict. If Bovard's testimony is correct, it would appear that Lindgren and Kirkeby physically obstructed the driveway with the intent to intimidate or interfere with a person because the person sought or provided reproductive health services. If the testimony of Lindgren and Kirkeby is correct, they did not physically obstruct the driveway. None of the three is a disinterested or dispassionate witness. All three are motivated by strong beliefs, all three have suffered abuse from those who disagree with them, and doubtless all three live with a high level of stress. They come in frequent contact with each other in an emotionally charged environment. Their perceptions are unavoidably colored by their circumstances.

It is difficult to predict how this issue will be resolved after additional evidence has been offered at the hearing on the merits. However, the court is not required to predict the outcome with precision at this time. As the Court of Appeals explained in *Dataphase:*

> The major difficulty with the application of the traditional [four element] test has arisen from the phrase "probability of success on the merits." Some have read this element of the test to require in every case that the party seeking preliminary relief prove a greater than fifty per cent likelihood that he will prevail on the merits. Under this view, even if the balance of the other three factors strongly favored the moving party, preliminary relief would be denied if the movant could not prove mathematical probability of success at trial. Although this construction of the "probability of success" requirement is technically possible, we reject it.
>
> The very nature of the inquiry on petition for preliminary relief militates against a wooden application of the probability test.... In balancing the equities no single factor is determinative.... It follows

that the court ordinarily is not required at an early stage to draw the fine line between a mathematical probability and a substantial possibility of success.... [W]here the balance of other factors tips decidedly toward movant a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation.

*Dataphase,* 640 F.2d at 113. The United States has, through the testimony of Jane Bovard, shown a "substantial possibility" that it will prove a FACE violation by Lindgren and Kirkeby by their conduct in the clinic driveway.

### 3. Threat Of Irreparable Harm:

Bovard testified that some of the cars that the defendants halt in the driveway turn and leave, without the occupants entering the clinic. There is a threat that this conduct will cause irreparable harm by preventing individuals from obtaining lawful abortion services, or from doing so in a timely manner conducive to their health and safety. This threat is somewhat speculative. There is some doubt about whether Lindgren and Kirkeby are physically obstructing cars, Bovard did not testify specifically about how often cars leave without entering the facility, and it can only be assumed that some of the drivers who leave were potential patients. However, while the showing of a threat of irreparable harm is not as strong here as those discussed above, the presence of some threat has nevertheless been shown.

### 4. Weighing The Four Dataphase Factors:

The United States has shown a "substantial possibility" of proof on the merits, which is sufficient to meet the threshold on the third *Dataphase* factor. It has also met its duty of proving a threat of irreparable harm. Therefore, the court must now evaluate the other two *Dataphase* factors, and then weigh all four factors together in deciding whether to issue a preliminary injunction.

The second *Dataphase* factor requires balancing the threatened harm against the injury an injunction would cause to other parties. If a preliminary injunction is issued, Lind-

gren and Kirkeby will be injured by having their right to speak freely limited. However, an injunction aimed at this conduct can be very narrowly tailored to reduce that injury to a minimal level. On the other hand, the proof of the threat of irreparable harm was also not strong, although the consequences of denying access to legal abortion services are potentially serious.

The fourth and final *Dataphase* factor requires the court to consider the public interest. As has been stated above, the public has an interest in preserving the right to free speech generally, and to free speech on controversial topics such as abortion in particular. The public also has an interest in having the legal rights of its citizens upheld, and not having those rights frustrated by unlawful acts.

The four *Dataphase* factors are difficult to weigh regarding this conduct. The court concludes that the *Dataphase* factors, taken together, tilt toward granting some injunctive protection. The court cannot ignore the threat of harm arising from a physical obstruction of the driveway. However, the sweeping injunctive relief sought by the United States is out of proportion to that threat. The court will account for the close showing on the *Dataphase* factors by tailoring the injunctive relief for the driveway conduct as narrowly as possible, to ensure the driveway remains unobstructed until the hearing on the merits while still permitting the defendants to do their sidewalk counselling work.

### E. *Following Employee Home Incidents:*

#### 1. Factual Allegations:

 Peggy Estenson has worked at the FWHO facility as a staff nurse since July 14, 1994. She testified that after her first day of work, she left the clinic to walk home. Kirkeby was at the end of the driveway, and, seeing Estenson leaving, called to Lindgren. Estenson walked south on Fourteenth Street. As she reached the corner she looked back and saw Lindgren getting into his car. After she had walked another block, she saw Lindgren following her in his car. She walked past her street, and cut through some yards and alleys to elude him. She hid

for a short time. When she ventured onto a street again, she saw Lindgren in his car, driving slowly east while looking south, toward where she had been. On another occasion, while driving home, she saw Lindgren's car behind her. She drove around, and cut through an alley. While in the alley, she saw Lindgren drive by the block on which she lives.

Lindgren denies he ever followed Estenson. Regarding the first incident, he testified that he got in his car and drove south on another street to a gas station about eight blocks away. He bought gas and a soft drink. He produced an affidavit from the station attendant supporting this assertion. As he drove back toward the clinic, he saw Estenson walking. He had not seen her at the clinic before that day, and thought she was a patient. He drove by her to offer literature to her. Regarding the second incident, he stated that he had no idea what she was talking about.

#### 2. Probability Of Success:

Lindgren has offered an innocent explanation for what Estenson experienced that has some plausibility. Even without that explanation, there is not a substantial probability that the conduct described by Estenson could be proven to constitute force, a threat of force, or physical obstruction. The court will not issue preliminary injunctive relief based on that conduct.

### 4. *THE TERMS OF THE PRELIMINARY INJUNCTION:*

In crafting the preliminary injunction, the court is guided by *Madsen v. Women's Health Center, Inc.*, —— U.S. ——, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). In that case the Supreme Court ruled that injunctions restricting speech must "burden no more speech than necessary to serve a significant government interest," and must regulate constitutionally protected activity with "precision." *Id.* at 2525.

The court strongly emphasizes that this injunction will not replace or repeal the injunction previously issued by the North Dakota District Court. The state court injunction retains all of its legal force. The injunc-

tion now being issued by this court is in addition to the state court injunction, and is crafted to complement the provisions of that injunction.

In addition to the specific injunctive relief outlined below, the court will order all four defendants not to engage in further conduct prohibited by 18 U.S.C. § 248. This will provide the United States with a prompt and effective enforcement mechanism, and may serve, as a practical matter, to help avoid the need for criminal prosecutions.

### A. Injunctive Relief Arising From Brennan's Conduct:

■ Brennan made statements that are threatening and constitute a violation of 18 U.S.C. § 248(a), particularly in light of his strange, often nocturnal conduct. Bovard and Miks are understandably frightened by his statements and conduct, and the other clinic employees likely share those concerns. The court's goal is to keep Brennan away from those people, to decrease the likelihood that he will make threatening statements to them or cause injury to property or person. This is for Brennan's benefit as well. It appears that Brennan has difficulty controlling what he says, and may have difficulty controlling his actions. The court wants to diminish the chance for Brennan to get himself into further trouble, as well as to diminish the chance of a clinic employee being frightened or hurt. With a new summer approaching, the court is hoping to discourage any additional wrongful conduct pending the hearing on the merits.

Pursuant to 18 U.S.C. § 248(c)(2)(B) the court will therefore order Brennan to stay at all times at least 100 feet away from the clinic, the clinic employees, and the employees' homes. This will infringe somewhat upon Brennan's ability to speak on the issue of abortion in the manner he would like, but it is necessary and prudent in light of the grave concerns raised by his statements and conduct. Brennan remains free to speak in any other forum.

Although the three statements of Brennan's that cause the most concern were all made to law enforcement personnel, any injunction aimed at preventing that conduct would necessarily be quite broad, and the court will not attempt to do so. The law enforcement officers can handle those situations. This injunction is more in the nature of a protective order, to create a safe space between Brennan and the clinic and its employees.

### B. Injunctive Relief Arising From The Blockade And The Conduct In The Clinic Driveway:

■ The November 22, 1994, car blockade and the alleged conduct of Lindgren and Kirkeby in the driveway violated FACE in that they physically obstructed the clinic's driveway and sidewalk. The appropriate injunctive relief in both cases is to keep the driveway and sidewalk unobstructed. The court will not grant the United States the zone of exclusion around the clinic that it seeks, but the court will order the defendants to refrain from obstructing the driveway and private sidewalk in any way. In light of the fact that the November 22 blockade was set up during the night, this injunction will be in force at all times on all days, not just during clinic hours.

For clarity in enforcement and compliance, the driveway will be made strictly off-limits to the defendants. They will not be permitted to set foot in the driveway at any time. Lindgren complained this would make it difficult for him to hand literature to drivers who stop in the driveway to talk to him, but this is a slight infringement indeed in light of his egregious conduct in the blockade. This narrow and focused injunction will permit Lindgren and the other defendants to carry out the vast majority of the activities they currently engage in at the clinic, while also guaranteeing free access to the clinic at all times.

**It Is Ordered:**

1. The Defendants' Request For Judicial Notice (Docket No. 34) is **Denied;**

2. The unidentified defendants John and Jane Doe are **Dismissed** from this action and those names shall be stricken from the caption of this case on all future pleadings;

3. To the defendant John Brennan: you are **Ordered and Enjoined** to *at all times* keep at least 100 feet away from:

A. The property line of the Fargo Women's Health Organization facility at 11 14th Street South in Fargo, North Dakota;

B. Jane F. Bovard, George M. Miks, Delene Carol, Peggy Jo Estenson, and all other individuals employed by the Fargo Women's Health Organization; and

C. The homes of Jane F. Bovard, George M. Miks, Delene Carol, Peggy Jo Estenson, and all other individuals employed by the Fargo Women's Health Organization.

4. To the defendants Timothy K. Lindgren, Kathy Kirkeby, John Brennan, and Ronald D. Shaw: you are **Ordered and Enjoined** to *at all times:*

A. Refrain from blocking in any way the driveway or private sidewalk, or access to the driveway or private sidewalk, of the Fargo Women's Health Organization facility at 11 14th Street South in Fargo, North Dakota;

B. Refrain from stepping onto the property of the Fargo Women's Health Organization, including the driveway and private sidewalk on that property;

C. Refrain from stepping into the area defined by extending the north and south borders of the driveway east to the public road, comprising that portion of the public sidewalk that lies in front of, and that portion of the berm comprising the apron of, the driveway; and

D. Refrain from activity prohibited by 18 U.S.C. § 248.