**UNITED STATES of America, Plaintiff,**

v.

**Thomas J. BURKE, Defendant.**

No. 98–2319–JWL.

United States District Court,
D. Kansas.

July 31, 1998.

Melanie D. Caro, Office of United States Attorney, Kansas City, KS, for U.S.

Thomas J. Burke, Kansas City, KS, pro se.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

The United States of America brought this action seeking a permanent injunction against Thomas J. Burke pursuant to the Freedom of Access to Clinic Entrances Act of 1994 (FACE), 18 U.S.C. § 248, which authorizes suits for injunctive relief by the Attorney General of the United States. 18 U.S.C. § 248(c)(2). Plaintiff seeks to enjoin certain activity by Mr. Burke, an abortion protester, at Comprehensive Health of Planned Parenthood (CHPP), an Overland Park clinic providing reproductive health services.

After an initial hearing held on July 17, 1998, the court granted plaintiff's motion for a preliminary injunction. A hearing on the merits was held on July 30, 1998.[1] This Memorandum and Order constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). After considering all of the evidence, as well as the arguments of both parties, the court enters judgment for plaintiff as set forth in more detail below.

### FINDINGS OF FACT

From 1981 to April 1997, Comprehensive Health for Women (CHW) was a privately owned and operated reproductive health care center, located at 4401 W. 109th Street, Overland Park, Kansas. In April 1997, CHW was acquired by Planned Parenthood of Mid–Missouri and Eastern Kansas. The clinic is now known as Comprehensive Health of Planned Parenthood (CHPP). CHPP provides, as did CHW before it, both family planning and surgical services. CHPP's family planning services include gynecological

examinations, Pap tests, birth control, pregnancy testing and counseling, emergency contraception, HIV testing, testing and treatment of sexually transmitted infections, and menopausal services. Surgical services include abortion services (up to 24 weeks), tubal ligation, cryotherapy, and colposcopy.

CHPP is located in a two-story building situated in a complex of other office buildings. There is a driveway entrance on the northwest side of the building which leads to a parking lot on the south side of the building. There is a second entrance to the parking lot on the southeast side of the building. The clinic has one public entrance on the south side of the building. This entrance can be reached by crossing the parking lot then walking down the sidewalk to the door. The door to this entrance is kept locked and visitors are admitted by a security guard.

Maureen Casey has been employed by CHPP or its predecessor, CHW, since March of 1981. From 1987 to May of 1997, she held the position of Security Director. She currently works part-time at the clinic as a receptionist. Ms. Casey has encountered Mr. Burke on numerous occasions over the course of her employment at the clinic and testified at some length with respect to Mr. Burke's conduct at the clinic.

### Mr. Burke's Conduct Prior to the Enactment of FACE

According to Ms. Casey, Mr. Burke interfered with reproductive care at CHW on numerous occasions. On December 16, 1989, Mr. Burke was among a group of protesters arrested and charged with criminal trespass for blocking the main entrance to the clinic. Mr. Burke and the other protesters were standing in front of the main door with their arms locked together, preventing people from entering the clinic.

On January 18, 1992, Mr. Burke entered CHW, threw a wall-mounted television to the floor and physically attacked three female employees, including Ms. Casey and the receptionist. Ms. Casey testified that Mr. Burke hit her "hard" in the face and hit the

1. Pursuant to Fed.R.Civ.P. 65(a)(2), the evidence presented at the preliminary injunction hearing became part of the record on the merits.

receptionist several times, breaking her jaw.[2] Several men in the waiting area eventually restrained Mr. Burke and took him outside until the police arrived. Mr. Burke was arrested for battery and criminal property damage. Although Ms. Casey filed a complaint against Mr. Burke with the Overland Park Police, the Johnson County District Attorney declined prosecution for lack of evidence and Mr. Burke was subsequently released.

On August 28, 1993, Mr. Burke approached cars in the parking lot of CHW and told the patients inside the cars that "what they were doing was wrong." He refused to leave the property when asked and was arrested and charged with criminal trespass. After Ms. Casey filed a complaint with the Overland Park Police, Mr. Burke was convicted and sentenced to six months in jail.

On February 26, 1994, Mr. Burke was arrested at CHW and charged with criminal trespass after blocking the front door to the clinic, preventing a patient and her escort from entering, and refusing to leave the property. Mr. Burke was subsequently found guilty and sentenced to six months in jail.

*Mr. Burke's Conduct After the Enactment of FACE*

On June 10, 1995, Mr. Burke blocked the clinic entrance by sitting on a bench in front of the door and refused to leave when asked by security. When a car arrived with patients, Mr. Burke started to approach the car. The security guard blocked his way and Mr. Burke tried to go around him. When the security guard placed Mr. Burke in an arm lock and started walking him off the property, Mr. Burke fell limp. Mr. Burke was arrested by the Overland Park Police for criminal trespass and Ms. Casey filed a complaint against him. Mr. Burke was subsequently found guilty of the offense and sentenced to four months in jail.

On December 16, 1995, Mr. Burke stood at the front door of the facility and refused to allow personnel out of the clinic. Ms. Casey told Mr. Burke that he had to leave the premises. In response, Mr. Burke told Ms.

Casey that she should "stop killing babies; this may be your last chance." Ms. Casey advised him a second time to leave the premises. Again, Mr. Burke replied "This may be your last chance to stop, God is getting tired of it, and this may be your last chance." According to Ms. Casey, she felt threatened by Mr. Burke's statements and believed that he was capable of inflicting physical harm. Mr. Burke was subsequently arrested for criminal trespass, found guilty of the offense, and sentenced to six months in jail.

On June 22, 1996, Mr. Burke sat on the ground with his back against the front door of CHW and refused to move. Ms. Casey asked Mr. Burke to leave the premises and he refused. She then notified the Overland Park Police, who arrived shortly thereafter. The police asked Mr. Burke to move and not block the door. He refused to cooperate and the police had to physically remove Mr. Burke from the premises. After Ms. Casey filed a complaint, Mr. Burke was found guilty of criminal trespass and sentenced to six months in jail.

On September 10, 1996, CHW received a letter from "Brother Martin Francis," a common alias used by Mr. Burke. The letter was addressed to the clinic's doctors, Ms. Casey, and all other employees of the "Fox Hill Murder Mill." Due to its suspicious nature, Ms. Casey called the Overland Park Police. When the police arrived, the letter was opened by personnel. The letter stated: "The Lord says you have 60 days to stop killing babies. After that you are toast." The letter was signed by Mr. Burke. Ms. Casey told the police she believed Mr. Burke would carry out his threat due to his past history of criminal behavior towards the employees of CHW.

On January 11, 1997, Mr. Burke blocked the entrance to CHW with his body and refused to allow anyone to enter or exit the facility. After being asked to leave four times by Tom Bradley, a security guard, Mr. Burke laid down on the sidewalk in front of the door to block the entrance. Ms. Casey testified that a woman and her escort came to the door and had to walk around Mr.

---

2. During the hearing, Mr. Burke conceded that he had struck these employees.

Burke to enter. The woman had tears in her eyes and appeared very upset.

James Ho, a police officer with the Overland Park Police Department, testified that when he arrived at the clinic, he observed Mr. Burke on the sidewalk in front of the clinic door with his hands handcuffed behind him. When Officer Ho asked Mr. Burke to stand up and walk to the patrol car, Mr. Burke refused. At that point, Officer Ho, Officer Lacey (another officer with the Overland Park Police Department who had arrived at the facility) and Mr. Bradley picked up Mr. Burke, carried him to the patrol car, and placed him inside.

Officer Ho proceeded to transport Mr. Burke to the police department. After advising Mr. Burke of his *Miranda* rights and receiving Mr. Burke's waiver of those rights, Officer Ho asked Mr. Burke whether it was his intention to block the front door of CHW in an effort to prevent people from entering and exiting the facility. Mr. Burke replied, "Yes." Officer Ho asked him whether Mr. Bradley had asked Mr. Burke to leave the premises. Mr. Burke replied, "Yes," and acknowledged that he did not leave the premises when asked. Finally, Officer Ho asked Mr. Burke to relate what happened after Mr. Bradley asked him to leave the premises. Mr. Burke stated, "I laid down in front of the door to block the entrance." Mr. Burke was charged with criminal trespass, subsequently found guilty of the offense, and sentenced to six months in jail.

While Mr. Burke was incarcerated for this incident, Federal Bureau of Investigation (FBI) Special Agent Tony E. Triplett interviewed Mr. Burke in connection with the FBI's responsibilities to investigate possible violations of FACE.[3] During the interview, Mr. Burke told Special Agent Triplett that he was familiar with FACE and was aware that he had violated the Act in the past. Mr. Burke further advised Special Agent Triplett that he "would follow the laws of God and not the laws of men." Finally, Mr. Burke informed Special Agent Triplett that he intended to violate the Act again.

3. The Overland Park Police Department had notified Special Agent Triplett of Mr. Burke's con-

On January 17, 1998, Mr. Burke again appeared at CHPP. Carl Trober, a security guard at CHPP, testified to the following events. In preparation for opening the facility, Mr. Trober assumed his normal position just inside the public entrance of CHPP. Shortly thereafter, he noticed a couple arrive in a pickup truck and park in the second row of the south parking lot of CHPP. As the couple was walking towards the entrance to CHPP, Mr. Trober opened the front door outward and held it open with his right foot.

Upon holding the door open for the couple, Mr. Trober observed Mr. Burke running around the corner of the building towards him. Mr. Burke cut across the grass to reach the sidewalk leading to the front entrance. As he was running towards Mr. Trober and the couple, Mr. Burke was shouting "This has got to stop! This has to stop now!" and carrying pamphlets in his right hand. Although Mr. Trober told Mr. Burke to leave the property, Mr. Burke continued to shout and move toward the sidewalk.

Mr. Burke finally stopped and stood directly in front of Mr. Trober, who was still holding the front door of the clinic open with his right foot. At this point, Mr. Burke was completely blocking the main entrance to CHPP. By this time, the couple who had parked their pickup truck in the lot were walking down the sidewalk to the main entrance and were within a short distance from the front door. Within seconds, Mr. Burke turned around and started towards the couple. As he did so, Mr. Burke lifted his arm to approximately shoulder height and made a gesture toward the woman. The woman's husband stepped in front of her to stop Mr. Burke from proceeding forward.

According to Mr. Trober, he believed that Mr. Burke was going to physically assault the woman. As a result, he grabbed Mr. Burke by the shoulders, brought him to the ground near the clinic entrance, and restrained his hands. Personnel inside CHPP advised the couple to return to their car and

duct.

wait until Mr. Burke was removed from the premises.

When Officer Ho arrived at the clinic, he observed Mr. Trober holding Mr. Burke face down on the sidewalk directly in front of the clinic door. After handcuffing Mr. Burke, Officers Ho and Lacey asked Mr. Burke to stand up and move away from the clinic door. Mr. Burke refused to move. The officers then grabbed Mr. Burke by his arms and pulled him approximately six feet away from the door on the sidewalk. After repeatedly requesting that Mr. Burke stand up and walk, and receiving no response, Officers Ho and Lacey were forced to carry Mr. Burke to the patrol car. At that time, Mr. Trober was able to let several patients into the clinic, including the couple who had been approached by Mr. Burke. Mr. Burke was convicted of criminal trespass and sentenced to six months in jail.

According to Lieutenant Charles Lawhead, a deputy with the Johnson County Sheriff's Department and a shift commander at the Johnson County Adult Detention Center, Mr. Burke served his sentence for this incident in "disciplinary segregation"[4] as a result of Mr. Burke's behavioral history. Lt. Lawhead had come into contact with Mr. Burke numerous times as a result of Mr. Burke's frequent incarcerations and had observed a noticeable change in Mr. Burke's attitude, actions and demeanor. Lt. Lawhead described Mr. Burke as "passive, model inmate" with few citations during his early incarcerations (*i.e.,* the 1993–1994 time period). Beginning in 1995, however, Lt. Lawhead observed Mr. Burke becoming more aggressive. In fact, Mr. Burke had been placed in disciplinary segregation for pulling a TV from the wall and smashing it on the floor after seeing a news report about an abortion pill; battering another inmate due to a difference of religious beliefs; and battering a guard from the Detention Center in an unprovoked fight. Based on his frequent discussions with and observations of Mr. Burke over time, Lt. Lawhead feared that there was "real danger" that Mr. Burke might hurt someone.

Mr. Burke was released from the Johnson County Adult Detention Center on July 15, 1998. As set forth above, a preliminary injunction issued on July 17, 1998 prohibited Mr. Burke from committing criminal trespass and engaging in conduct violative of FACE. According to Cliff O'Rear, Director of Security at CHPP, Mr. Burke appeared at CHPP on July 25, 1998. Mr. Burke stayed on the sidewalk and was "very quiet."

## CONCLUSIONS OF LAW

FACE subjects to criminal and civil liability anyone who

> by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services.

18 U.S.C. § 248(a)(1). The United States Attorney General may bring a civil action if she "has reasonable cause to believe that any person or group of persons is being, or has been, or may be injured by conduct constituting a violation of [FACE]." *Id.* § 248(c)(2)(A). In such an action, the court "may award appropriate relief, including temporary, preliminary or permanent injunctive relief." *Id.* § 248(c)(2)(B).[5]

---

4. According to Lt. Lawhead, only inmates with "major offenses" are placed in disciplinary segregation. Inmates are permitted out of the unit only one hour per day with full restraints.

5. Although Mr. Burke has not challenged the constitutionality of FACE, every circuit that has addressed the issue has held that FACE passes constitutional muster. *See, e.g., Hoffman v. Hunt,* 126 F.3d 575 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1838, 140 L.Ed.2d 1089 (1998); *United States v. Bird,* 124 F.3d 667 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1189, 140 L.Ed.2d 320 (1998); *Terry v. Reno,* 101 F.3d 1412 (D.C.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997); *United States v. Soderna,* 82 F.3d 1370 (7th Cir.), *cert. denied sub nom. Hatch v. United States,* —— U.S. ——, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996); *United States v. Dinwiddie,* 76 F.3d 913 (8th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996); *Cheffer v. Reno,* 55 F.3d 1517 (11th Cir.1995). Thus, the court believes that the Tenth Circuit would similarly conclude that FACE is constitutional.

■ The first question, then, is whether Mr. Burke's conduct as described above constitutes a violation of the statute. The evidence submitted by plaintiff, and unrefuted by Mr. Burke, clearly establishes that Mr. Burke has, on numerous occasions, physically blocked the entrance to the clinic in an effort to prevent patients and employees from entering and exiting the facility. Mr. Burke has also accosted clinic patients and employees in a threatening manner, and even assaulted three employees on one occasion. Thus, Mr. Burke has, by intentionally intimidating and interfering with persons obtaining and providing reproductive health services through force and physical obstruction, engaged in conduct violative of the FACE Act.

Moreover, Mr. Burke admitted to Special Agent Triplett that he was familiar with FACE, was aware that he had violated the Act, and that he intended to violate the Act again. During a discussion with Officer Ho, Mr. Burke admitted that his intention in blocking the clinic entrance was to prevent people from entering and exiting the facility.

■ Having determined that Mr. Burke has violated FACE on numerous occasions, and even intends to violate the Act in the future, the court now turns to address the appropriate relief to which plaintiff is entitled. Plaintiff seeks a permanent injunction against Mr. Burke. As set forth in more detail below, the court concludes that injunctive relief is an appropriate remedy here. *See* 42 U.S.C. § 248(c)(2)(B) (expressly authorizing court to award permanent injunctive relief). *See also Madsen,* 512 U.S. at 767–68, 114 S.Ct. 2516 (recognizing that the government's interests in protecting a woman's freedom to seek lawful medical services in connection with her pregnancy; ensuring the public safety and order; and protecting the property rights of all its citizens are "sufficient to justify an appropriately tailored injunction").

■ In determining whether injunctive relief is appropriate, the court must consider whether the moving party will suffer irreparable injury unless the injunction issues; whether the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and whether the injunction, if issued, would be adverse to the public interest. *Schmidt v. Holy Cross Cemetery, Inc.,* 840 F.Supp. 829, 836 (D.Kan.1993) (citing *Seneca–Cayuga Tribe v. State. ex rel. Thompson,* 874 F.2d 709, 716 (10th Cir.1989)). The court concludes that plaintiff has established all three elements here.

■ With respect to the "irreparable injury" query, the Tenth Circuit has recognized that this element need not be shown "[w]hen the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations." *Mical Communications, Inc. v. Sprint Telemedia, Inc.,* 1 F.3d 1031, 1035 (10th Cir.1993). As set forth above, the evidence presented here clearly establishes that Mr. Burke engaged in conduct prohibited by FACE on numerous occasions and intends to engage in such conduct in the future. Thus, irreparable injury need not be shown here.[6] The court further concludes that, particularly in light of the narrow range of conduct prohibited by the injunction, the threat of harm to clinic patients and employees significantly outweighs any harm the injunction may cause Mr. Burke. The injunction only prohibits Mr. Burke from committing criminal trespass or violating FACE. Thus, Mr. Burke will still be permitted to express his views from the sidewalk outside the clinic. Finally, the court finds no evidence of any harm to the public if an injunction is ordered.

■ Moreover, a permanent injunction "should not be issued as punishment for past violations, but rather, as insurance against future ones." *Reich v. IBP, Inc.,* 820 F.Supp. 1315, 1329 (D.Kan.1993) (issuing permanent injunction where danger of future violations was evident) (citing *Mitchell v. Hertzke,* 234 F.2d 183 (10th Cir.1956)).

6. In any event, the court finds that Mr. Burke's repeated and increasingly aggressive acts have had an adverse impact on both the emotional state of women seeking services at the clinic and the physical well-being of employees providing services at the clinic. Such harm would be irreparable in the absence of an injunction.

Here, the likelihood that Mr. Burke will violate FACE in the future is high. First, Mr. Burke advised Special Agent Triplett that he intended to violate FACE in the future. Moreover, Mr. Burke's demeanor during the hearing on the merits convinces the court that his sincere and strongly held convictions about the evils of abortion will dictate his conduct. Mr. Burke called two female witnesses who had each had abortions to testify about their regrets for having "killed their babies." Despite plaintiff's repeated objections to the relevance of this testimony, and the court's sustaining those objections, Mr. Burke continued to argue about serious public policy issues related to abortion that are well beyond the scope of the limited issues presented here.[7] Finally, Mr. Burke entered into evidence graphic pictures of aborted fetuses in an effort to visually depict for the court the heinous nature of "this crime against God." In short, Mr. Burke's behavior clearly indicates to the court his sincere belief that his actions are ordained by a higher authority and, thus, that he will continue to act according to his own beliefs rather than what the law dictates.

■ The court also concludes that the scope of the injunction is sufficiently narrowly tailored to pass constitutional muster. The Supreme Court has stated that the applicable standard in such cases is whether the injunction burdens more speech than necessary to serve the significant government interests in protecting public safety and a persons' freedom of access to reproductive services. *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 765–68, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). Here, plaintiff seeks to permanently enjoin Mr. Burke from the following activities:

(1) blocking, impeding, inhibiting, or in any other manner obstructing or interfering with access to, ingress into, and egress from the CHPP clinic or parking lot, located at 4401 W. 109th Street, Overland Park, Kansas;

(2) entering onto the private property of CHPP, including its parking lots and building;

(3) physically abusing, grabbing, touching, harassing, threatening, assaulting, intimidating and/or interfering with any person attempting to obtain or provide reproductive health services; and

(4) encouraging, inciting, or securing other persons to commit any of the prohibited acts listed herein.[8]

Significantly, the injunction leaves open ample alternative methods of communication and permits Mr. Burke to engage in such communication from the sidewalk around the clinic. Moreover, the injunction does not impose any buffer zone between Mr. Burke and the clinic property. In fact, the injunction permits Mr. Burke to stay on the public sidewalk that runs through the clinic property. As such, the court finds the injunction appropriate, narrowly tailored to the evidence presented in this case, and significantly less intrusive than injunctions upheld by other courts. *See, e.g., Madsen,* 512 U.S. at 769–70, 114 S.Ct. 2516 (holding that 36–foot buffer zone around clinic burdens no more speech than necessary to accomplish governmental interest at stake); *Lucero v. Trosch,* 121 F.3d 591, 605 (11th Cir.1997) (upholding 25–foot buffer zone around clinic property); *United States v. McMillan,* 946 F.Supp. 1254, 1269 (S.D.Miss.1995) (approving 25–foot buffer zone around clinic boundaries); *United States v. Lindgren,* 883 F.Supp. 1321, 1333 (D.N.D.1995) (approving 100–foot buffer zone around clinic, clinic employees, and employees' homes).

---

7. Mr. Burke also attempted to call as a witness an eight-year-old boy who had been "saved" by Mr. Burke during a 1989 protest (*i.e.,* the boy's mother had changed her mind about having an abortion after she was confronted by Mr. Burke). Because the boy's mother had testified, the court sustained plaintiff's objection to the boy's testimony as cumulative.

8. In its proposed findings of fact and conclusions of law, plaintiff also seeks to enjoin Mr. Burke from "engaging in loud singing, chanting, whistling, shouting, yelling or using bullhorns, auto horns, or sound amplification equipment or other sounds audible inside [CHPP]." Plaintiff did not seek such relief in its complaint and failed to submit any evidence with respect to whether Mr. Burke had engaged in these activities. Thus, the court will not include this proposed prohibition in its order.

**IT IS THEREFORE ORDERED BY THE COURT THAT** judgment for plaintiff be entered permanently enjoining defendant Thomas J. Burke from engaging in the following acts:

(1) impeding, inhibiting, or in any other manner obstructing or interfering with access to, ingress into, and egress from the CHPP clinic or parking lot, located at 4401 W. 109th Street, Overland Park, Kansas;

(2) entering onto the private property of CHPP, including its parking lots and building;

(3) physically abusing, grabbing, intimidating, threatening, harassing, touching, pushing, shoving, crowding, or assaulting persons working at or using services at or entering or leaving the CHPP clinic; or

(4) encouraging, inciting, or securing other persons to commit any of the prohibited acts listed herein.

**IT IS FURTHER ORDERED THAT** a copy of this order be served upon Mr. Burke by the United States Marshal.

**IT IS SO ORDERED.**