**The PEOPLE OF the STATE OF NEW YORK, by Eliot SPITZER, Attorney General of the State of New York, Plaintiff,**

v.

**Joseph A. KRAEGER; Victoria Kraeger; Sheri Kraeger; and Vicki Jo Syverson, Defendants.**

**No. 01–CV–249.**

United States District Court, N.D. New York.

Aug. 24, 2001.

Hon. Eliot Spitzer, Attorney General of the State of New York, New York City, Carrie H. Cohen, Asst. Attorney General, Jennifer K. Brown, Director, Reproductive Rights Unit, of Counsel for plaintiff.

John J. Broderick, Syosset, NY, for defendants.

### MEMORANDUM–DECISION AND ORDER

HURD, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ....................................................363

II. TRIAL ............................................................363

III. FINDINGS OF FACT...............................................364
 A. The Utica Clinic ...............................................364
 1. Contacts with Patients and Staff.....................................365
 a. Face–to–Face Contact...........................................365
 b. Other Threats to Staff..........................................367

 1) Package .................................................367
 2) Signs and Posters ......................................367
 3) St. Mary of Mt. Carmel Church ........................368
 c. Disruption of Medical Care ...........................369
 2. Interference with Ingress and Egress ......................369
 a. Activities In and Near Sidewalk ......................369
 b. Activities In and Near Driveway ......................370
 3. Other Activities of the Defendants .......................370
 B. The Lowville Clinic .........................................371
 C. Medical Arts ...............................................371

IV. CONCLUSIONS OF LAW ........................................372
 A. Controlling Law ............................................372
 1. Acts of force, threats of force, and physical obstruction ..................372
 2. Intent to injure, intimidate, or interfere with access because of
 obtaining or providing reproductive health services ..................374
 B. Constitutionality of FACE under the First Amendment ....................374
 C. Violations of FACE and Clinic Access Act ...............................375
 1. Acts of Force ..........................................375
 2. Threats of Force .......................................375
 3. Physical Obstruction ...................................376
 D. Other State Law Claims ....................................376
 1. Civil Rights Law § 40-c ................................376
 2. Public Nuisance .......................................377
 E. Damages ...................................................377
 1. For Violations of FACE and the Clinic Access Act ....................377
 2. For Violations of Civil Rights Law § 40-c ...........................378
 F. Permanent Injunction .......................................378

V. CONCLUSION .........................................................379

## I. INTRODUCTION

The plaintiff, the People of the State of New York ("People"), moved for a preliminary injunction, enjoining the defendants Joseph Kraeger ("Mr. Kraeger"), Victoria Kraeger ("Mrs. Kraeger"), Sheri Kraeger ("Sheri"), and Vicki Jo Syverson ("Vicki Jo"), from obstructing access to reproductive health care facilities in the Northern District of New York and threatening patients and staff. The People also seek statutory damages and civil penalties for the defendants' alleged violations of the Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. § 248, the New York State Clinic Access Act ("Clinic Access Act"), N.Y. Civ. Rights Law § 79–m (McKinney 1999), and Section 40–c of the New York Civil Rights Law (McKinney 1992). The defendants contend that their conduct does not violate federal or state law.

Oral argument was heard on April 13, 2001 in Utica, New York. In accordance with an Order dated April 20, 2001, (Docket No. 25), the hearing for plaintiff's application for a preliminary injunction was consolidated with a trial on the merits, pursuant to Fed.R.Civ.P. 65(a)(2).

## II. TRIAL

A three day bench trial was conducted from July 9, 2001 through July 11, 2001 in Utica, New York.

Margaret Roberts, Co–President and Chief Executive Officer of Planned Parenthood Mohawk Hudson, as well as Betty–Joan Beaudry, Jeffrey Chard, Theresa Casullo, Frank Drayton, Cheryl Lincoln–Lovely, and Jennifer Rodriguez, who are employees of the Planned Parenthood clinic in Utica, New York ("Utica clinic"), and

Carol Feduccia, who is an employee of Medical Arts Ob–Gyn, P.C. in Utica, New York ("Medical Arts") testified in support of the People. Also testifying in support of the People were Gina Cabral Valente, a patient of the Utica clinic, Jana Reynolds, whose daughter is a patient of the Planned Parenthood clinic in Lowville, New York ("Lowville clinic"), and Maryanne Rockhill, a patient of the Lowville clinic. In addition, Utica Police Department Officers Frances Alesandro, Louis Capri, George DeAngelo, Thomas Dreimiller, and Lee Moreale, Sergeant David Alsheimer, and Lowville Police Department Officers David Casselman and Sharon Padden–Jackson testified in support of the People. Finally, Jodean Bracken and Mary DeTraglia, both secretaries for a law firm located across Genesee Street from the Utica clinic, testified in support of the People.

Mr. Kraeger, Mrs. Kraeger, Sheri, and Vicki Jo all testified as defendants. Also testifying in support of the defendants were Danielle Fay and fellow picketers Father Donald Bauer, Father Hugh Connaghan, Fred Enos, Karen Jackson, Dorothy Roback, William Tapley, and Patricia Wankel.

Proposed Findings of Fact and Conclusions of Law were filed by the plaintiff on June 18, 2001 and by the defendants on June 22, 2001. Based upon all of the evidence, including written declarations from many of the witnesses for the plaintiff, the exhibits received in evidence, and the credibility of the witnesses, the following constitutes the Findings and Fact and

Conclusions of Law pursuant to Fed. R.Civ.P. 52.

## III. FINDINGS OF FACT

All of the defendants, who are pro-life activists, have prior arrests for their protest activities at reproductive health care facilities in the Northern District of New York.[1] Mr. and Mrs. Kraeger have been convicted of trespass and have been found in contempt of court. These arrests and/or convictions have not deterred the defendants from continuing their activities. This case focuses on their activities at three reproductive health care facilities in the Northern District of New York: The Utica clinic, the Lowville clinic, and Medical Arts.[2]

### A. The Utica Clinic

The Utica clinic, located at 1424 Genesee Street, Utica, New York, provides various reproductive health services, including counseling and medical services related to birth control, pregnancy, and abortion. Mr. and Mrs. Kraeger, along with their adult daughters, Sheri and Vicki Jo, regularly protest outside the Utica clinic. The defendants protest differently, that is, they are more subdued and quiet, when other protestors are present. Thus, most of the defendants' witnesses, who testified about the defendants' conduct in their presence, is unhelpful.

Genesee Street is heavily trafficked near the Utica clinic and is a two-way street consisting of two driving lanes each way.

---

1. Unless a defendant is specifically named, the conduct described is attributed to all of the defendants.

2. The People challenge the defendants' involvement in the decision of a medical practice in Boonville, New York to revoke an agreement it had to rent space to Planned Parenthood one day per week. However, the defendants peacefully picketed the location and lawfully circulated a petition, which was presented to the doctors in the medical practice. While these activities contributed to the decision not to rent space to Planned Parenthood in Boonville, there is no evidence that the defendants exercised their First Amendment rights in anything but a lawful manner with respect to this incident.

Parking is permitted on both sides of the road in front of the Utica clinic. There is a public sidewalk that is five feet wide in front of the clinic, and a strip of grass between the sidewalk and the curb which is approximately fifteen feet wide. The sidewalk intersects with a concrete walkway that is ten feet wide, which consists of three steps, then a landing, and a second set of five steps which leads up to the front door of the clinic. The walkway bisects the clinic's front lawn. The Utica clinic driveway, which is thirteen feet wide, is located on the north side of the property and runs alongside the clinic and ends in a parking lot in back of the clinic. There is a telephone pole on a strip of grass just north of the clinic driveway, and another to the south.

Nurses Candlelight Park ("Nurses Park"), a public park, is located adjacent to the clinic to the north of the clinic driveway. Between the clinic driveway and the Nurses Park driveway is a concrete and stone wall and a wooden fence. An apartment building is to the south. The diagram attached hereto and made a part hereof as Exhibit 1 shows the Utica clinic and its surroundings.

### 1. Contacts with Patients and Staff

#### a. Face–to–Face Contact

Mrs. Kraeger, Sheri, and Vicki Jo often run up to women they perceive to be actual or potential patients of the clinic, stand very close to them while walking either side-by-side with them, directly on their heels, or just in front of them, and try to push literature on them. When they approach these people, they begin speaking in a normal, conversational tone of voice in order to, in their words, "counsel" the person. However, if the patient indicates that she is not interested or wants to be left alone, Mrs. Kraeger, Sheri, and Vicki Jo continue to follow the patient, try to give her literature, and begin to yell at her. If the person tries to walk around them, they move with her and impede her progress. In other words, if the "counseling" approach does not work, then "counseling" quickly turns into attempts at blockage and intimidation.

Sometimes, the "counseling" escalates even further, far beyond intimidation to actual physical assault. For example, consider the compelling testimony of Gina Cabral Valente ("Mrs. Valente"),[3] who was a patient at the Utica clinic, and a very credible witness. On February 21, 2000, Mrs. Valente exited the clinic's front door and proceeded to walk down the clinic steps. Mrs. Kraeger ran up to her, shoved some pamphlets into her hands, asked if she knew that Planned Parenthood killed babies, and began to yell loudly and aggressively that "she was doing the work of God and that she could save [her] baby." (Tr. at 80.)[4] When Mrs. Valente asked Mrs. Kraeger to leave her alone, Mrs. Kraeger kept standing in front of her to prevent her from walking away. When Mrs. Valente took a step forward or to the side, Mrs. Kraeger would match her steps and bumped into her several times all the way to Mrs. Valente's car, which was

---

**3.** It is interesting to note that Mrs. Valente, who was pregnant at the time of the incident in question, was not seeking an abortion, but rather, kept her baby.

**4.** According to Mrs. Kraeger, she noticed a rosary hanging from the mirror of Mrs. Valente's car and decided to ask her about being Catholic. Her manner of broaching the subject was to comment "do you know that if you help anyone procure an abortion, you are excommunicated from the Catholic church, and you can no longer call yourself Catholic," (Tr. at 812), and repeatedly suggesting that Mrs. Valente talk to a priest. This less than subtle approach understandably irritated Mrs. Valente.

parked along the west curb, north of the clinic driveway. Mrs. Kraeger bumped her all the way from the bottom of the clinic steps, onto the grassy strip between the sidewalk and the curb, and pushed her into the road, while yelling that she "was going to be punished by God" and "let me save your baby". *Id.* at 85. The women eventually reached Mrs. Valente's car, whereupon Mrs. Kraeger blocked Mrs. Valente's car door and had to be pushed out of the way. When Mrs. Valente, now very scared and threatened, attempted to drive away, Mrs. Kraeger stood in front of the driver's side window. Mrs. Kraeger refused to move out of the way, preventing Mrs. Valente from being able to pull out of the parking spot. Eventually, she was able to pull away.[5]

Mrs. Kraeger, and Sheri also frequently follow and yell at staff members as they enter and leave the Utica clinic. On one occasion, Mrs. Kraeger confronted Theresa Casullo, a current employee of Planned Parenthood, who, at the time, was approaching the Utica clinic to interview for a job. Mrs. Kraeger walked side-by-side with her, tried to step in front of her, and yelled in her face. Mrs. Kraeger also followed Frank Drayton, an African–American employee of the Utica clinic, while he was escorting a patient away from the clinic, and called him an "Uncle Tom" and said he was a disgrace to his race. *Id.* at 463.

On April 17, 1997, while staff member Jeffrey Chard ("Mr. Chard") was escorting a patient, Mr. Kraeger stood so closely to them that he stepped on Mr Chard's heels not once, but three times, causing him to fear that Mr. Kraeger would harm him. This action on the part of Mr. Kraeger was intentional. On another occasion, as Mr. Chard drove out of the clinic driveway, Mr. and Mrs. Kraeger made a U-turn in their van on Genesee Street and followed him. After being followed for a few blocks, Mr. Chard pulled to the curb. Mr. and Mrs. Kraeger pulled behind him and sat for a short time, then drove away. Another time, Mr. Chard heard Mrs. Kraeger warn a patient, "Are you sure you want to go in there? There are a lot of wackos going around shooting people." (Chard Decl. ¶ 8.) Mr. Chard interpreted this to be a threat to himself and the patient.

In January 1999, Mr. Chard was at a courthouse to testify at Mrs. Kraeger's trial on trespassing charges arising out of an incident at the Utica clinic. When directed to wait outside the courtroom, he sat down on a bench in the hallway. Mr. Kraeger walked up to Mr. Chard, sat down on the bench approximately three feet away, and began to move closer to him. Mr. Chard became nervous and stood up, whereupon Mr. Kraeger said "[W]hat are you afraid of. . . . You have nothing to be afraid of if you haven't done anything wrong." *Id.* at 291. Mr. Chard called a security guard to come over because he was disturbed by Mr. Kraeger's actions and comments.

---

5. This is not the first time Mrs. Kraeger has gone to great lengths for her cause. On one occasion, when she learned that an inmate in a Watertown jail was pregnant and considering having an abortion, Mrs. Kraeger got herself arrested on purpose in order to get into the jail so she could talk to the inmate. She also refused to leave after she had served her sentence because she had not yet talked to the inmate.

Mr. Kraeger has also taken extreme measures for his cause. He chained himself to a stairwell which led up to the entrance of the office of Dr. George Couch, a doctor who performed abortions. On another occasion, he trespassed into Dr. Couch's office and locked himself in an examination room. As a result of Mr. Kraeger's activities, Dr. Couch obtained an order of protection against him. (Pl.'s Ex. 87.)

When Mrs. Kraeger sees staff member Betty–Joan Beaudry ("Ms. Beaudry") at the Utica clinic, she typically yells to her that she needs to "repent" or that she needs to find a different job. *Id.* at 239. In October 1998, Mrs. Kraeger followed Ms. Beaudry and a peer educator from a Planned Parenthood event to Ms. Beaudry's car, while continuously yelling at them. *Id.* at 235. In March 1999, upon leaving a community event for adolescents sponsored by the Community Based Adolescent Pregnancy Prevention program, Mrs. Kraeger again followed Ms. Beaudry and warned, "You need to repent because you never know how long you have." (Beaudry Decl. ¶ 15.) When Ms. Beaudry asked Mrs. Kraeger whether her statement was intended as a threat, Mrs. Kraeger merely repeated the same statement. Based upon this statement, Ms. Beaudry feared for her physical safety.

### b. *Other Threats to Staff*

#### 1) *Package*

On February 9, 1998, less than two weeks after a fatal bombing at a clinic which provided abortions, Mr. and Mrs. Kraeger protested at the Utica clinic. Mrs. Kraeger buzzed the receptionist and said she was delivering a package for Margaret Roberts ("Ms. Roberts"), the Co–President and CEO of Planned Parenthood Mohawk Hudson. The receptionist told Mrs. Kraeger to leave, which she did, leaving the package behind in the clinic vestibule.

The package was a cardboard box, approximately 6″ × 8″ in size, wrapped in duct tape, and marked "Attention: Margaret Roberts" with no return address. (Pl.'s Ex. 40.) Ms. Roberts, in accordance with training she received concerning bombs, feared that this package was a bomb. She carried it out of the clinic, walked up to Mr. Kraeger, and opened the package next to him. Inside were anti-birth control and natural family planning pamphlets and a handwritten note from Mrs. Kraeger asking Ms. Roberts to place the pamphlets in the clinic.

None of the defendants had ever sent materials in a box before, and never did subsequent to this incident. No reason was given as to why the pamphlets had to be delivered in this manner. The pamphlets could have been delivered in a business sized envelope or merely banded together by a rubber band.

The defendants' emphasis on the fact that there was no actual bomb in the box is unpersuasive. A threat is a threat, whether or not it is actually carried out. It is ludicrous to believe that Mrs. Kraeger's conduct could not be considered a threat unless the clinic were actually bombed and people were injured or killed.[6] The package sent by Mrs. Kraeger was a threat, intended to frighten and intimidate Ms. Roberts and the staff at the Utica clinic.

The defendants' attempt to emphasize that Ms. Roberts is hypersensitive to bomb threats is also unavailing. It is precisely because Ms. Roberts is particularly sensitive to, and aware of, bomb threats to abortion providers, that Mrs. Kraeger's conduct constitutes a threat. The nature of a threat is to attempt to take advantage of a person's sensitivities. Ms. Roberts was afraid and her fear was justified.

#### 2) *Signs and Posters*

In October 1998, Mrs. Kraeger and Sheri placed posters on telephone poles around the clinic which read as follows:

---

6. For example, it is clearly a threat to point an unloaded firearm at someone if that person is unaware that the firearm is without ammunition.

WANTED:
INFORMATION
leading to the
identification of
the ABORTIONIST
at Planned Parenthood,
1424 Genesee st. (sic) Utica.
If you have information,
Please contact: PROJECT
I.D., P.O. Box 616, Boonville
N.Y. 13309.
*$100.00 REWARD is being
offered for *accurate*
information leading to
the abortionists (sic) I.D.
$100.00 REWARD

(Pl.'s Ex. 41.) Shortly after Dr. Barnett Slepian, a doctor who performed abortions in Buffalo, New York, was murdered, new "wanted" posters appeared, increasing the reward to $200.00. Sheri completed the application for the post office box listed on the posters, which she registered in the name of "Vicky Kraeger, President of Stop Planned Parenthood." (Pl.'s Ex. 43.) The defendants stated a legitimate purpose for posting the "wanted" posters, i.e., to identify the doctor performing the abortions at the Utica clinic in order to investigate his/her qualifications and identify any potential risks to patients. However, the timing of the second round of posters certainly reasonably increased the feelings of fear and intimidation on the part of staff at the Utica clinic.

On January 29, 1999, a sign was posted near the Utica clinic and Ms. Roberts' home which read: "MARGARET ROBERTS Directs the KILLING of BABIES AT Planned Parenthood." (Pl.'s Ex. 44.) In March and April of 1999, the following sign was also posted near the Utica clinic: "M. ROBERTS STOP DIRECTING BABY KILLING." (Pl.'s Ex. 45.) Also in March 1999, the following signs were posted near Ms. Roberts' home: "MARGARET ROBERTS BABY KILLER" (with blood drops dripping from each letter in the word "KILLER"), (Pl.'s Ex. 46), and "MARGARET ROBERTS: THE BA-BIES['] BLOOD IS ON YOUR HANDS." (Pl.'s Ex. 47.) In light of the prior bomb threat by Mrs. Kraeger, and the language and graphic nature of these signs, Ms. Roberts reasonably felt threatened and feared for her physical safety.

On July 28, 2000, Jennifer Rodriguez, an employee of Planned Parenthood Mohawk Hudson, was at the Utica clinic for a meeting. When she drove out of the clinic driveway and reached the public sidewalk, Mrs. Kraeger moved toward her car and held a poster in Ms. Rodriguez' passenger side window which read "Kill the Abortionists Not the Babies." (Rodriquez Decl. ¶ 5.) Ms. Rodriguez, scared by the poster, rolled up her passenger side window and immediately drove away. Mrs. Kraeger testified that the poster actually read "[W]hy is it not okay to kill an abortionist, but it is okay to kill a baby." (Tr. at 854.) Neither the original nor a copy of the poster was admitted into evidence at trial. However, even if the sign read as Mrs. Kraeger claims, it does not change the thrust of the message or Ms. Rodriguez' reasonable reaction to it.

On one occasion, Sheri placed a sign next to Mr. Chard's car, which was parked along the curb directly in front of the Utica clinic, that stated "[T]his car paid for by blood money." (Chard Decl. ¶ 11.) The fact that Sheri placed the sign there caused Mr. Chard to feel threatened.

### 3) *St. Mary of Mt. Carmel Church*

On May 4, 1999, Ms. Roberts arrived at St. Mary of Mt. Carmel Church, located on Jay Street in Utica, New York, to attend an interfaith antiviolence service. A number of protestors, including Mr. Kraeger, Mrs. Kraeger, and Sheri were demonstrating on the sidewalk in the front of the church as Ms. Roberts approached. Mr. Kraeger broke away from the group of

demonstrators, approached Ms. Roberts and yelled to her, "You are not going in my church Margaret." (Roberts Decl. ¶ 54.) He stepped directly in front of her and pushed her with his body to prevent her from walking forward. Mr. Kraeger continued to step in front of her and moved with her as she tried to move away from him.

Utica Police Officer Frances Alesandro came over to the scene and heard Mr. Kraeger yelling to Ms. Roberts that she was a murderer and did not belong in a church. Officer Alesandro escorted Ms. Roberts up the church steps. Mr. Kraeger again ran up to get near Ms. Roberts, but ran into Officer Alesandro instead. Mr. Kraeger was arrested for disrupting a religious service, in violation of N.Y. Penal Law § 240.21 (McKinney 2000), and resisting arrest, in violation of Penal Law § 205.30. While he was being taken into custody, Mr. Kraeger continued to yell words to the effect that Ms. Roberts "was a murderer and worked for the devil." (Alesandro Decl. ¶ 7.) Mr. Kraeger pled guilty to both charges.[7]

After Mr. Kraeger was arrested, Mrs. Kraeger and Sheri attempted to prevent other people from entering the church. As individuals approached the church, Mrs. Kraeger and Sheri approached them and tried to give them literature. If a person indicated that they were not interested, Mrs. Kraeger and Sheri continued to walk side by side with the person or directly behind them and tried to push literature in the person's hand. Again, "counseling" turned into attempts of intimidation.

### c. *Disruption of Medical Care*

The defendants' actions outside the Utica clinic disrupts medical treatment.

First, patients arrive nervous and upset. Staff members have to spend time calming patients down before the purpose for their visit can be addressed. Second, some patients request an escort out of the clinic, or permission to leave through the back door of the clinic, which requires bypassing security. This interrupts the work of staff who have to escort the patients out of the clinic. Finally, on a few occasions, a car has pulled up to the curb in front of the Utica clinic and a woman got out. When the defendants came up to her, either she would immediately get back into the car, or the driver would call to her to get into the car, and they would drive away. (*See* Tr. at 281–82.)

On many occasions, Sheri and Vicki Jo stand in the Nurses Park driveway and yell into open windows on the north side of the clinic. (*See* Pl.'s Exs. 17, 28, 30.) They have yelled warnings that staff will "burn in hell" and that they have "blood on [their] hands." (Lincoln–Lovely Decl. ¶ 14.) Their yelling disrupts the staff and distracts patients and makes them nervous.

On several occasions, Mrs. Kraeger and Sheri used a video camera to record their activities as well as patients and staff entering and leaving the clinic. However, they knew that the Utica clinic had surveillance video cameras and merely wanted to gather clear footage on their own camera to capture any incidents.

### 2. *Interference with Ingress and Egress*

### a. *Activities In and Near Sidewalk*

The defendants frequently obstruct access to and from the Utica clinic. They

7. As a result of this incident, Ms. Roberts obtained an order of protection against Mr. Kraeger. (Pl.'s Ex. 81.)

often stand right next to or directly in front of the clinic steps which lead from the sidewalk up to the clinic, sometimes side by side, holding large signs that are approximately 3' × 5' in size. Mr. Kraeger and Vicki Jo have been seen forming a U-shape with other protestors in front of the clinic steps, blocking access to the clinic. The defendants do not move to allow patients or pedestrians to pass by, and make it difficult for people to enter or leave the walkway. Pedestrians sometimes walk past the clinic in the street because there is no room on the sidewalk.[8] They also pace the entire length of the narrow clinic sidewalk while holding large signs, making it difficult for people to walk on the sidewalk.

The defendants also walk in circles with large signs directly in front of the clinic steps. Officer DeAngelo testified that when someone comes out of the Utica clinic, the defendants move closer together and walk "tighter" together in a circle directly in front of the steps, (Tr. at 361), making it more difficult for patients to get through them. He also testified that the defendants do not yield space on the sidewalk to anyone. In fact, he has escorted elderly people to Nurses Park from their apartments, which are located next door to the clinic to the south, by taking them across Genesee Street, up one block, and back across Genesee Street because they do not want to walk by the defendants.

### b. *Activities In and Near Driveway*

The Utica clinic driveway is narrow and only has room for one car at a time. (*See* Pl.'s Exs. 19, 23.) The defendants stand on the part of the sidewalk that intersects the driveway, and stand right next to the driveway, with large signs on sticks. The

defendants also walk across the part of the sidewalk that intersects the driveway carrying large signs. Mrs. Kraeger, Sheri, and Vicki Jo stand in the driveway and walk extremely slowly across the driveway when cars attempt to pull into and out of the driveway, causing delay for patients and staff entering and leaving the driveway. The defendants also rush toward the driveway when they see a car attempting to leave the clinic driveway. One defendant stands in the driveway while another stands on the north side and yells at the driver. While there is no evidence that the defendants activities causes a significant delay, backup in traffic, or accidents, it does delay access to the clinic by patients and staff.

Mr. Kraeger, Mrs. Kraeger, and Sheri stand in front of the clinic in the street where parking is permitted and block the parking spaces. They also place large signs against the telephone pole on the north side of the driveway or stand near the telephone pole holding a large sign, which restricts the vision of drivers trying to exit the clinic from the driveway. The defendants park their large two-toned brown and tan van near or in front of the clinic and mount a large sign that extends above the van and approximately one foot on each side. When the van is parked on the street at the southern edge of the driveway with the sign mounted, it is difficult for drivers attempting to leave the driveway to see the northbound traffic and for northbound drivers that want to turn into the driveway to see the driveway. However, the van is legally parked and no parking tickets have been issued.

### 3. *Other Activities of the Defendants*

Plaintiff and defendants have also presented evidence of other acts by the vari-

---

**8.** In the winter, when there is snow and ice, the defendants' conduct makes it even more difficult, and sometimes hazardous, for pa-
tients, staff, and pedestrians to maneuver around them. (*See* Pl.'s Exs. 16, 19, 20.)

ous defendants involving the Utica clinic. However, because these activities were either not significant or were clearly the lawful exercise of their right to protest, specific findings have not been made.

### B. *The Lowville Clinic*

The Lowville clinic provides reproductive health services including counseling and medical services related to birth control and pregnancy, but does not perform abortions. Although not on a regular basis, the defendants have protested outside of the Lowville clinic.

The Lowville clinic is located in a multi-use commercial building on the corner of Elm Street and State Street. (Pl.'s Exs. 33, 84.) Steps lead up from a small parking area in front of the building to a porch where the front door of the clinic is located. Mrs. Kraeger and Sheri hold large signs and stand or pace in the parking area right in front of the steps, thereby making it difficult for people to move around them or go up the steps.

Maryanne Rockhill, a patient at the Lowville clinic, approached one day for an appointment. She is a nurse and was dressed in her uniform when she arrived for her appointment. Vicki Jo, who was standing right in front of the steps and evidently assumed that Ms. Rockhill worked at the Lowville clinic, asked her "what it was like to work at a place that killed babies." (Tr. at 648.) When Ms. Rockhill left the clinic after her appointment, Vicki Jo again approached her, asked her if "it was okay for people to kill babies," *id.* at 650, and followed her to her car. Vicki Jo stood near the car and did not move until Ms. Rockhill started slowly backing up.

Although Ms. Rockhill testified that Sheri engaged in this conduct, Vicki Jo admitted at trial that she, not Sheri, was involved in this incident. Thus, the credibility of Ms. Rockhill's testimony is suspect. Also, Ms. Rockhill did not encounter any significant or unreasonable delay in leaving the clinic.

The defendants park their large van parallel to the clinic steps. When they do this, it makes access to the steps difficult. However, except one occasion when Mr. Kraeger was issued a summons for parking too close to a sidewalk, the defendants' van is legally parked and no other tickets have been issued.

### C. *Medical Arts*

Medical Arts, which is located at 1522 Old Burrstone Road, Utica, New York, provides reproductive health services, including gynecological and obstetric care, but does not perform abortions. The defendants have also protested outside of Medical Arts.

On December 28, 2000, Mrs. Kraeger was protesting outside. Carol Fedducia, an office manager at Medical Arts, was a passenger in a car which attempted to enter the driveway, which was snow-covered and slushy. Mrs. Fedducia testified that Mrs. Kraeger appeared suddenly and stood in front of the bumper of the car in the driveway. When she began to move out of the way, she only took very small steps toward the side of the driveway as the driver inched the car slowly forward. However, in the winter, the sidewalks near Medical Arts were not shoveled. Therefore, picketers had to stand alongside the driveway and the road. Mrs. Kraeger did not suddenly appear in the driveway from nowhere. Further, it was reasonable for Mrs. Kraeger to take small steps to move out of the way when she was holding a large sign and the driveway was snow-covered and slushy. Finally, Ms. Fedducia did not encounter any significant or unreasonable delay.

## IV. CONCLUSIONS OF LAW

### A. Controlling Law

■ Congress enacted FACE in 1994 "in an effort to combat the continuing violence against, and forcible interference with, abortion clinics, those providing or receiving abortion-related services, and their families." *United States v. Hart,* 212 F.3d 1067, 1071 (8th Cir.2000)(citing H.R.Rep. No. 103–306, at 5–7 (1993), *reprinted in* 1994 U.S.C.C.A.N. 699, 701–03). FACE provides for criminal penalties and civil remedies for anyone who

> [B]y force or threat of force or by physical obstruction, intentionally injuries, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services. . . .

§ 248(a)(1). Thus, to establish a violation of FACE, a plaintiff must demonstrate that the defendant 1) engaged in acts of force, threats of force, or physical obstruction, 2) with the intent to injure, intimidate, or interfere with a person who 3) sought or provided, or is seeking or seeking to provide reproductive health services.

FACE authorizes the Attorney General of a state to commence a suit in the name of the state. § 248(c)(3)(A). In actions commenced by the Attorney General, the statute permits seeking injunctive relief as well as compensatory damages and civil penalties. § 248(c)(3)(B). In lieu of compensatory damages, the plaintiff may elect to recover statutory damages of $5,000 per violation. § 248(c)(1)(B). Civil penalties may not exceed $10,000 in cases of nonviolent physical obstruction, and may not exceed $15,000 for other violations. § 248(c)(2)(B).

■ The New York State Clinic Access Act provides that "[w]henever the attorney general ... has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of section 240.70 or 240.71 of the penal law, the attorney general ... may bring an action ... to permanently enjoin such violation." N.Y. Civ. Rights Law § 79–m. Penal Law § 240.70 defines the crime of criminal interference with health care services or religious worship in the second degree, a class A misdemeanor, which is virtually identical to FACE.[9] Since the language of the Clinic Access Act is almost identical to FACE, the standards for proving a violation of the Clinic Access Act is the same as those for proving a violation of FACE. *See Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180 (2d Cir.1992)(stating that New York courts consistently look to federal law "in expounding the Human Rights Law.").

### 1. Acts of force, threats of force, and physical obstruction

■ Although the term "force" is not defined in the statute, the legislative history indicates that any type of physical assault constitutes force within the meaning of FACE. *See* H.R.Rep. No. 103–706. Acts such as hitting, pushing, shoving, kicking, and knocking over an escort have been found to constitute force within the meaning of the statute. *United States v. Dinwiddie,* 76 F.3d 913, 926 (8th Cir.1996); *United States v. Scott,* 958 F.Supp. 761, 775 (D.Conn.1997), *aff'd,* 145 F.3d 74 (2d Cir.1998).

---

**9.** Penal Law § 240.71 defines the crime of Criminal interference with health care services or religious worship in the first degree, which is a class E felony. A violation of § 240.71 requires a prior conviction for criminal interference with health care services or religious worship in the first or second degree.

FACE also prohibits threats of force or physical harm that are reasonably foreseeable to create apprehension in the listener of bodily harm to him or herself or another. *Cheffer v. Reno,* 55 F.3d 1517, 1521 (11th Cir.1995); *Scott,* 958 F.Supp. at 773. A "true threat" must be distinguished from protected speech. *Dinwiddie,* 76 F.3d at 925. "The court must analyze an alleged threat 'in the light of its entire factual context' and decide whether the recipient of the alleged threat could reasonably conclude that it expresses 'a determination or intent to injure presently or in the future.'" *Id.* Relevant context to consider are the national climate of violence at reproductive health care clinics, and assaults on physicians and clinic workers in the area or elsewhere in the nation. *See, e.g., id.; United States v. McMillan,* 53 F.Supp.2d 895, 905 (S.D.Miss.1999). Other relevant factors are whether the statement was uttered directly to the victim, the reaction of the victim and other listeners, whether the threat was conditional, and whether the similar statements were made to the victim in the past. *Dinwiddie,* 76 F.3d at 925 (holding that approximately 50 comments made to Planned Parenthood medical director warning "[R]emember Dr. Gunn (an abortion provider who had been murdered).... This could happen to you.... He is not in the world anymore.... Whoever sheds man's blood, by man his blood shall be shed" constituted threats of force).

The following statements have been found to be threats of force in violation of FACE:

1) Statement to a clinic doctor, rhetorically asking "Where is a pipebomber when you need one." *McMillan,* 53 F.Supp.2d at 898.

2) Statement to a clinic administrator, "You're young. But just because you are young does not mean your life won't be taken early." *Scott,* 958 F.Supp. at 769.

3) Statement to a clinic security guard, "A bullet could come your way today." *Id.* at 770.

Physical obstruction is defined as "rendering impassable ingress to or egress from a facility ... or rendering passage to or from such a facility ... unreasonably difficult or hazardous." § 248(e)(4). It is not necessary to show that a clinic was shut down, that people could not get into a clinic at all for a period of time, or that anyone was actually denied medical services. *United States v. Gregg,* 32 F.Supp.2d 151, 156 (D.N.J.1998). Rather, encountering interference, harassment, and traffic hazards when attempting to enter or leave a clinic have all been found to meet the "unreasonably difficult or hazardous" standard. *Scott* 958 F.Supp. at 775–76; *United States v. Lindgren,* 883 F.Supp. 1321, 1330–31 (D.N.D.1995); *United States v. White,* 893 F.Supp. 1423, 1431–32 (C.D.Cal.1995). In *Scott,* the court concluded that Scott violated the physical obstruction aspect of FACE by "standing so close to patients' cars that they were unable to open their doors, standing within one foot of patients, forcing them to maneuver around him to get to the clinic," and by stepping in front of escorts and patients to prevent them from walking past, using signs to prevent escorts from walking past him, running up to and after patients, and continuing to yell at them despite requests to be left alone. 958 F.Supp. at 768–69, 775–76. In *Lindgren,* on a motion for a preliminary injunction, the government alleged that protestors stood at the edge of or in the driveway to intercept entering cars, forcing cars to stop or be delayed. 883 F.Supp. at 1329–30. The court indicated that if evidence offered at a hearing on the merits proved these allegations, such con-

duct would constitute physical obstruction in violation of FACE. *Id.* at 1331.

**2. Intent to injure, intimidate, or interfere with access because of obtaining or providing reproductive health services**

■ With respect to the intent element of the statute, the defendant's purpose in engaging in obstructive acts is irrelevant. *See United States v. Weslin,* 156 F.3d 292, 298 (2d Cir.1998), *cert. denied,* 525 U.S. 1071, 119 S.Ct. 804, 142 L.Ed.2d 665 (1999). As the Second Circuit stated in response to the defendants' argument that their objective was to save the lives of unborn children, not to violate FACE,

> No matter what their ultimate purpose in blockading the clinic may have been, the defendants do not deny—nor could they plausibly deny—that they meant to block the entrances to the Planned Parenthood clinic ... and that they did so because they wished to prevent the clinic from performing abortions. Congress has expressly defined "reproductive health services" to include "services relating to ... the termination of a pregnancy," 18 U.S.C. § 248(e)(5). It follows that the defendants, whatever their motive may have been, did intend to obstruct and interfere with the obtaining and provision of reproductive health services as defined by Congress. That is all the intent the statute requires.

*Id.*

Intimidation means "to place a person in reasonable apprehension of bodily harm to him- or herself or to another." § 248(e)(3). Interference "means to restrict a person's freedom of movement." § 248(e)(2).

**B. Constitutionality of FACE under the First Amendment**

Although not challenged by the defendants, it is important to note that FACE has been found constitutional under the First Amendment. *See Weslin,* 156 F.3d

292; *see also United States v. Wilson,* 154 F.3d 658 (7th Cir.1998), *cert. denied,* 525 U.S. 1081, 119 S.Ct. 824, 142 L.Ed.2d 681 (1999); *United States v. Bird,* 124 F.3d 667 (5th Cir.1997); *Hoffman v. Hunt,* 126 F.3d 575 (4th Cir.1997); *Terry v. Reno,* 101 F.3d 1412 (D.C.Cir.1996); *United States v. Soderna,* 82 F.3d 1370 (7th Cir. 1996); *Dinwiddie,* 76 F.3d 913; *Cheffer,* 55 F.3d 1517. The Second Circuit has held that "FACE is a valid exercise of Congress's power under the Commerce Clause", and is a content-neutral regulation because it "prohibits obstruction of reproductive health clinics regardless of the issue that animates the demonstrators." *Weslin,* 156 F.3d at 296–97; *see also Hart,* 212 F.3d at 1073 (stating that FACE is not a content-based statute because "it prohibits the obstruction of reproductive health services without regard to the issue motivating the speech").

■ The constitutionality of a content-neutral statute that potentially regulates protected expression is subject to intermediate scrutiny. In order to survive intermediate scrutiny, the statute must satisfy a three part test: "(i) the regulation must serve an important or substantial governmental interest; (ii) the interest must be unrelated to the suppression of expression, [and] (iii) the incidental restriction of First Amendment freedoms must be narrowly tailored to that interest." *Weslin,* 156 F.3d at 297 (citing *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)).

■ FACE satisfies this standard. First, the government has an important interest in, inter alia, ensuring public safety and order, protecting a woman's right to seek reproductive health care services, and ensuring that reproductive health services remain available. *Id.; Dinwiddie,* 76 F.3d at 924. These interests are "unrelated to

the suppression of expression." *Weslin,* 156 F.3d at 297–98. Finally, since "FACE regulates only uses of force, threats of force, and physical obstruction", it leaves reasonable alternatives for persons to exercise their First Amendment rights. *Dinwiddie,* 76 F.3d at 924. Therefore, it is narrowly tailored to protect the government's interest.

Since FACE has been found constitutional, the Clinic Access Act, which is virtually identical, is also constitutional.

## C. *Violations of FACE and Clinic Access Act*

■ The People failed to prove any violations at the Lowville clinic or Medical Arts by a fair preponderance of the credible evidence. However, the People have proven that the defendants did violate FACE and the Clinic Access Act at the Utica clinic by engaging in many acts of force, threats of force, and physical obstruction.

### 1. *Acts of Force*

Mr. Kraeger stepped in front of Ms. Roberts and pushed her when she attempted to enter St. Mary of Mt. Carmel Church. By using force against her, he intentionally intimidated and interfered with her because she is a reproductive health care provider. Mr. Kraeger also used force against staff member Mr. Chard by walking so closely to him that he intentionally stepped on Mr. Chard's heels three times. In doing so, Mr. Kraeger interfered with Mr. Chard's freedom of movement and intimidated him.

Mrs. Kraeger has also used force in the name of her cause. She accosted, yelled at, pushed, and bumped into Mrs. Valente while following her to her car. Mrs. Kraeger targeted Mrs. Valente because she sought reproductive health care services at the Utica clinic, and intentionally intimi-

dated her and interfered with her freedom of movement.

### 2. *Threats of Force*

Probably the clearest threat of force in this entire case is the package which Mrs. Kraeger delivered and left in the vestibule of the Utica clinic. The package, a cardboard box, wrapped in duct tape, and containing no return address, was clearly meant to look like a bomb. Further, the fact that this incident occurred shortly after a fatal bombing of a clinic which provided abortions, only adds to the reasonableness of Ms. Roberts' fear that the package was a bomb.

Mrs. Kraeger also engaged in other threats of force. She made threats of physical harm when she warned Ms. Beaudry "You need to repent because you never know how long you have" and warned a patient in Mr. Chard's presence "Are you sure you want to go in there? There are a lot of *wackos going around shooting people.*" Ms. Beaudry and Mr. Chard reasonably interpreted these statements as threats.

Mrs. Kraeger and Sheri also affixed several posters which had no legitimate purpose other than to intimidate staff at the Utica clinic, particularly Ms. Roberts. Specifically, the posters they placed near Ms. Roberts' home which labeled her a "Baby Killer" and warned that the babies' blood is on her hands served no legitimate purpose. These posters caused Ms. Roberts to reasonably fear for her physical safety. Also, Mrs. Kraeger shoved a poster which read "Kill the abortionists not the babies" into the passenger side window of the car of Planned Parenthood employee Ms. Rodriguez as she attempted to leave the Utica clinic. There was no legitimate purpose for this poster either, and the manner in which Mrs. Kraeger displayed it

to Ms. Rodriguez could reasonably be perceived as frightening and intimidating.

### 3. *Physical Obstruction*

All four defendants run toward, and stand in or near, the Utica clinic's driveway, often holding large signs, when patients and staff attempt to enter or leave. All four defendants also pace slowly in front of the clinic walkway with large signs, and stand directly in front of the walkway with large signs, sometimes side by side, blocking access to the clinic. They also slowly pace the entire length of the sidewalk while holding large signs, and do not yield any space for pedestrians. This interferes with ingress and egress of patients and staff of the Utica clinic and the ability of pedestrians to move freely and unimpeded on the sidewalk.

Mrs. Kraeger, Sheri, and Vicki Jo often crowd patients, walk very closely to them, and step in their way, making it very difficult for patients to maneuver around them. When patients indicate they are not interested in being "counseled", Mrs. Kraeger, Sheri, and Vicki Jo cease "counseling" and begin to yell at, and attempt to intimidate, them.

### D. *Other State Law Claims*

#### 1. *Civil Rights Law § 40–c*

■ Civil Rights Law § 40–c provides: "No person shall, because of ... sex, ..., be subjected to any discrimination in his civil rights, or to any harassment, as defined in section 240.25 of the penal law, in the exercise thereof, by any other person ...." Harassment is defined as "intentionally and repeatedly harass[ing] another person by following such person in or about a public place or places or by engaging in a course of conduct or by repeatedly committing acts which places such person in reasonable fear of physical injury." Penal Law § 240.25. Abortion protestors who intentionally deprive women of their constitutional right to choose to have an abortion, and subject them to harassment when they seek to exercise that right, violate § 40–c. *See Pro–Choice Network of W. New York v. Project Rescue W. New York,* 799 F.Supp. 1417, 1431 (W.D.N.Y.1992)(finding a likelihood of success on the claim that interference with clinic access violates § 40–c), *aff'd in relevant part,* 67 F.3d 359 (2d Cir.1994), *vacated in part on reh'g en banc,* 67 F.3d 377 (2d Cir.1995), *cert. granted sub nom. Schenck v. Pro–Choice Network of W. New York,* 516 U.S. 1170, 116 S.Ct. 1260, 134 L.Ed.2d 209 (1996), *aff'd in part & rev'd in part,* 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997).

Any person who violates § 40–c "shall for each and every violation thereof be liable to a penalty of not less than one hundred dollars nor more than five hundred dollars, to be recovered by the person aggrieved ...." § 40–d. The Attorney General may seek penalties on behalf of aggrieved persons, as long as the penalties are paid to the actual victims. *See People v. Hamilton,* 125 A.D.2d 1000, 1001, 511 N.Y.S.2d 190 (N.Y.App. Div. 4th Dep't 1986).

The People argue that "[b]y targeting women because of their pregnancy or perceived pregnancy, defendants discriminate on the basis of sex in violation of section 40–c." (Mem. of Law in Supp. of Mot. for Prelim. Inj. at 20.) However, this is not entirely correct. As has been discussed extensively above, the defendants do not specifically target pregnant women for harassment. While they do harass women they perceive as pregnant, they also harass staff members, male and female alike. Thus, it is more accurate to say that the defendants' discrimination is against people associated with Planned Parenthood,

not merely women they perceive as pregnant.

Even so, the defendants have violated § 40–c for a reason slightly different than that proffered by the plaintiff. The defendants, especially Mrs. Kraeger, Sheri, and Vicki Jo, harass women seeking to exercise their civil right to obtain reproductive health care services and, in some cases, the right to choose to have an abortion. Mrs. Kraeger specifically has violated § 40–c by following, bumping, and yelling at Mrs. Valente as she exited the Utica clinic.

### 2. *Public Nuisance*

 A public nuisance "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co. of New York, Inc.*, 41 N.Y.2d 564, 394 N.Y.S.2d 169, 362 N.E.2d 968 (N.Y.1977) (citation omitted). In order to establish a public nuisance, a considerable number of people must experience a substantial annoyance, discomfort, or interference. *See State v. Fermenta ASC Corp.*, 166 Misc.2d 524, 531, 630 N.Y.S.2d 884 (N.Y.Sup.Ct.1995), *aff'd*, 238 A.D.2d 400, 656 N.Y.S.2d 342 (N.Y.App. Div.2d Dep't 1997).

In *New York State National Organization for Women v. Terry*, the defendants engaged in full scale blockades of reproductive health care facilities, thereby significantly delaying or wholly depriving access to such facilities. 704 F.Supp. 1247 (S.D.N.Y.1989), *aff'd in relevant part*, 886 F.2d 1339 (2d Cir.1989). The court found that "[t]he right to obtain an abortion, and more generally, to have access to medical care, is a public right 'common to all.' " *Id.* at 1261. The court went on to hold that the

> [D]efendants' activities have the intended effect of shutting down clinics, which in turn causes delay or an absolute loss of a woman's ability to obtain an abortion or other medical services. Defendants, then, have interfered with the public's common right to obtain medical services, and have injured the health of a considerable number of persons. Moreover, defendants' activities have in the past and threaten in the future to obstruct vehicular and pedestrian traffic in violation of N.Y. Penal Law § 240.20 subd. 5 (McKinney 1980).

*Id.* at 1261–62.

 In the present case, it is true that the defendants conduct interferes with the public's right to access to medical care, and in some cases, the right to obtain an abortion. However, the People failed to show that a considerable number of people have been affected by the defendants conduct. Nor has it shown that, other than Ms. Roberts and Mrs. Valente, such people have been subject to substantial annoyance, discomfort, or interference. Further, the defendants in this case did not engage in egregious blockades of reproductive health care clinics, as the defendants in *Terry* did. *See* 704 F.Supp. 1247. Finally, the evidence does not show that vehicular traffic was significantly slowed down. Therefore, the People have failed to demonstrate that the defendants' conduct rises to the level of a public nuisance.

### E. *Damages*

#### 1. *For Violations of FACE and the Clinic Access Act*

Since the defendants have violated FACE, they are subject to statutory damages of $5,000 per violation.

Mr. Kraeger is liable for three violations of FACE: 1) Physical contact with Ms. Roberts at St. Mary Mt. Carmel Church, 2) Stepping on Mr. Chard's heels, and 3) Blocking the clinic steps. Accordingly, Mr. Kraeger is assessed statutory damages in the amount of $15,000.

Mrs. Kraeger is liable for five violations of FACE: 1) Delivering the package which was designed to look like a bomb, 2) Crowding patients and physically accosting Mrs. Valente, 3) Verbally threatening Ms. Beaudry, 4) Affixing posters that disparaged Ms. Roberts, and 5) Blocking the clinic driveway. For these five violations, Mrs. Kraeger must pay statutory damages of $25,000.

Sheri, like her father, is liable for three violations of FACE: 1) Crowding and yelling at patients, 2) Interfering with access to the clinic driveway, and 3) Affixing the posters disparaging Ms. Roberts. Therefore, Sheri must also pay statutory damages in the amount of $15,000.

Finally, Vicki Jo is liable for two violations of FACE: 1) Crowding and yelling at patients, and 2) Blocking the clinic steps. Therefore, Vicki Jo must pay statutory damages of $10,000.

For their violations of FACE, the defendants are also liable for civil penalties of not more than $10,000 per violation for nonviolent physical obstruction, and not more than $15,000 for other violations.

Mr. and Mrs. Kraeger's conduct consisted of nonviolent physical obstruction as well as physical acts and threats of physical harm. Therefore, they are assessed civil penalties in the amount of $5,000 each. Since Sheri's and Vicki Jo's conduct constituted nonviolent physical obstruction, they are assessed civil penalties in the amount of $2,500 each.

## 2. *For Violations of Civil Rights Law § 40-c*

Mrs. Kraeger violated Civil Rights Law § 40-c by egregiously harassing and physically pushing Mrs. Valente. Therefore, Mrs. Kraeger must pay damages to Mrs. Valente in the amount of $200.

### F. *Permanent Injunction*

■ "Injunctions against speech have long been disfavored." *United States v. Mahoney*, 247 F.3d 279, 285 (D.C.Cir.2001)(citing *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)). An injunction which restricts speech must be 1) content neutral and 2) must "burden no more speech than necessary to serve a significant government interest." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994).

■ The People have demonstrated that injunctive relief is necessary to serve significant government interests, which are the same as those proffered and accepted in *Madsen*, 512 U.S. at 767–68, 114 S.Ct. 2516, and *Schenck*, 519 U.S. at 376, 117 S.Ct. 855; ensuring public safety and order, promoting free flow of traffic on streets and sidewalks, protecting property rights, and protecting women's right to seek pregnancy related services. Thus, the only question is whether the injunction burdens "no more speech than necessary" to achieve these objectives.

While the United States Supreme Court has approved of buffer zones to protect reproductive health facilities and their patients and staff, courts must use discretion to craft a buffer zone that protects a defendant's First Amendment right, but also eliminates the threat to the government interest. *Madsen*, 512 U.S. at 769–70, 114 S.Ct. 2516; *Schenck*, 519 U.S. at 381, 117 S.Ct. 855. Buffer zones ranging from fifteen feet, *Schenck*, 519 U.S. at 380, 117

S.Ct. 855, to five hundred feet, *Dinwiddie* 76 F.3d at 928–29, have been upheld.

In the present case, provisions 1(A) through 1(F) of the permanent injunction filed herewith, merely prohibits conduct that is independently unlawful, and thus do not raise any First Amendment issues.[10]

The buffer zone instituted in this case applies to the Utica clinic only, and applies only to the four named defendants.[11] It encompasses the following parameters: From a point on the west side of the sidewalk perpendicular with utility pole number 28 (point 1); proceeding in an easterly direction through said utility pole to a point ten feet east of the west curb of Genesee Street (point 2); proceeding in a southerly direction parallel to the west curb to a point perpendicular with utility pole number 90 (point 3); and proceeding in a westerly direction through said utility pole to a point on the west side of the sidewalk (point 4). The buffer zone is outlined in red on the diagram attached hereto and made a part hereof as Exhibit 1.

The buffer zone is a small zone necessary to provide patients and staff unrestricted access to the front of the clinic and the clinic driveway. The defendants still have alternative avenues of communication available. They can still stand adjacent to the buffer zone, verbally communicate to people, pass out literature, and hold signs. Further, the buffer zone creates clear guidelines for both the police department and the defendants to follow.

## V. CONCLUSION

The defendants have protested for a long period of time. Often their protests have been proper and lawful. However, they frequently walk on the line separating lawful from the unlawful exercise of their First Amendment rights. They have crossed over that line too many times to allow such conduct to go unaddressed. While the defendants seek to exercise their right to protest, they do not respect the rights of the people they come in contact with. As a result, the defendants

**10.** Certain provisions of the proposed permanent injunction submitted by the People have been rejected. Specifically, provision 1(G), which seeks to prohibit demonstrating, congregating, standing, sitting, lying down, or posting or carrying signs in or on any street or roadway that is immediately adjacent to any doorway, walkway, or driveway entrance to any such facility, or chasing any person into any such street or roadway, is too broad and there is no evidence that the defendants ever participated in this conduct before.

Provision 1(H), which seeks to prohibit openly photographing, videotaping, appearing to photograph or videotape, or aiming a still or video camera at persons who are entering or leaving any such facility is not warranted because the People's contention that Mrs. Kraeger and Sheri videotape patients and staff to intimidate them is rejected.

Finally, the People's proposed permanent injunction seeks to create a fifteen foot buffer zone at the Lowville clinic. However, the

plaintiff's position on this issue is unclear. While it argues in its memorandum of law in support of a preliminary injunction that it seeks a buffer zone only at the Utica clinic, plaintiff's counsel at trial stated in her closing argument that the People seek a buffer zone at both the Utica and Lowville clinics. Nevertheless, the issue is academic in light of the fact that the People have failed to prove any violations at the Lowville clinic.

**11.** The People's proposed permanent injunction seeks to enjoin the defendants, "their agents and representatives, and all other persons whomsoever, known or unknown, acting in their behalf or in concert with them, and receiving actual notice of this Order." However, when cross-examining most of the defendants' witnesses, who were colleagues of the defendants at protests, the People repeatedly emphasized that it was not seeking to restrict their conduct in any way, only the defendants' conduct. (*See* Tr. at 668, 709, 753, 769, 791–92.)

must be penalized and their activities curbed.

Accordingly, it is

ORDERED, that

1. The People are awarded a total of $80,000, which represents the following items of damages due as a result of the defendants' violations of FACE and the Clinic Access Act:

 a. Statutory damages of $15,000 from defendant Joseph Kraeger;

 b. Statutory damages of $25,000 from defendant Victoria Kraeger;

 c. Statutory damages of $15,000 from defendant Sheri Kraeger;

 d. Statutory damages of $10,000 from defendant Vicki Jo Syverson;

 e. Civil penalties of $5,000 from defendant Joseph Kraeger;

 f. Civil penalties of $5,000 from defendant Victoria Kraeger;

 g. Civil penalties of $2,500 from defendant Sheri Kraeger; and

 h. Civil penalties of $2,500 from defendant Vicki Jo Syverson;

2. For her violation of Civil Rights Law § 40-c, defendant Victoria Kraeger is directed to pay $200 to Gina Cabral Valente;

3. The public nuisance claim is DISMISSED; and

4. A permanent injunction is GRANTED.

Judgment shall be entered accordingly.

IT IS SO ORDERED.